T.C. Memo. 2012-8

UNITED STATES TAX COURT

MARSHALL AND JUDITH COHAN, ET AL.,[1] Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos.   19849-05, 19854-05,   Filed January 10, 2012.
              19857-05.

Kenneth A. Glusman, Kelly M. Townsend, Jason T. Bell, and

Edward DeFranceschi, for petitioners.

Carina J. Campobasso and Michael R. Fiore, for respondent.


CONTENTS

FINDINGS OF FACT......................................... 6

    I.    Preliminary Matters........................... 6

---

[1]Cases of the following petitioners are consolidated
herewith:  John and Janet Aldeborgh, docket No. 19854-05; and
Robert and Susan Hughes, docket No. 19857-05.

II.    The Farm.................................... 7

       A.  Description............................. 7

       B.  1969 Agreement......................... 8

III.   Other Owners of Adjoining Land............. 11

IV.    Formation of HCAC.......................... 12

V.     Actions Taken With Respect to the Farm..... 13

VI.    Negotiations With TNC...................... 14

VII.   Final Agreement............................ 21

VIII.  The Closing................................ 25

       A.  Overview............................... 25

       B.  Four Properties Transferred to HCAC.... 26
           1.  Blue Heron......................... 26
           2.  Sanderling......................... 26
           3.  Lots 2 and 3....................... 27

       C.  Horse Barn Lease....................... 27

       D.  Aldeborgh Lease........................ 28

       E.  Lot 29 Option.......................... 29

       F.  Wild Right-of-Way Relocation and
           Other Road Modifications............... 30

       G.  New Beach Rights....................... 30

       H.  Release of the Reciprocal Right........ 31

       I.  Land Bank Fees......................... 31

       J.  Legal Fees Reimbursement............... 31

IX.    Postclosing Negotiations................... 32

X.     Federal Income Tax Reporting............... 36

XI.    Notices of Deficiency...................... 38

OPINION.......................................... 41

    I.      Burden of Proof............................. 41

    II.    Charitable Contribution Deductions............. 42

        A.  Background.................................. 42

        B.  Section 170 and Regulations................. 43

        C.  Analysis.................................... 45
            1.  Good-Faith Estimate..................... 46
            2.  Reasonable Reliance..................... 53
            3.  Substantial Compliance Doctrine........ 55
            4.  Conclusion.............................. 56

    III.   Valuation................................... 57

        A.  Background.................................. 57

        B.  Fair Market Value Standard.................. 58
            1.  Overview................................ 58
            2.  Common Approaches for Determining Fair
               Market Value............................ 60
                a.  Overview............................ 60
                b.  Market Approach..................... 60
                c.  Income Approach..................... 61
                d.  Asset-Based Approach............... 61

        C.  Experts..................................... 61

        D.  Overview of Expert Testimony................ 63
            1.  Mr. LaPorte............................. 63
            2.  Mr. Czupryna............................ 64

        E.  Valuation of the Four Properties............ 66
            1.  Blue Heron.............................. 66
                a.  Mr. LaPorte's Appraisal............ 66
                b.  Mr. Czupryna's Appraisal........... 67
            2.  Sanderling............................. 69
                a.  Mr. LaPorte's Appraisal............ 69
                b.  Mr. Czupryna's Appraisal........... 70
            3.  Lots 2 and 3............................ 71
                a.  Mr. LaPorte's Appraisal............ 71
                b.  Mr. Czupryna's Appraisal........... 72
            4.  Analysis................................ 73

F. Horse Barn Lease............................ 77
   1. Overview............................... 77
   2. Land Value............................ 79
   3. Rate of Return........................ 81
   4. Vacancy Adjustment.................... 82
   5. Conclusion........................... 82

G. Aldeborgh Lease............................ 83
   1. Overview............................. 83
   2. Land Value........................... 84
   3. Discount for Restricted Use.......... 85
   4. Fair Return Rate..................... 86
   5. Inwood Annuity Factor................ 86
   6. Conclusion........................... 87

H. Wild Right-of-Way Relocation............... 87

I. New Beach Rights........................... 89

IV. Gain From the Sale of the Rights of First
    Refusal................................... 91

A. Overview.................................. 91

B. Amount Realized........................... 92
   1. Number of New Beach Rights............ 93
     a. Petitioners' Position............. 93
     b. Respondent's Position............. 97
   2. Release of the Reciprocal Right
     Encumbering the Aldeborgh
     Children's Existing Properties.......... 97

C. Adjusted Basis............................ 98
   1. Wallace & Co. Payment.................100
   2. Success Fee...........................101
   3. Tax Advice...........................102

V. Character of Gain...........................103

VI. Accuracy-Related Penalties...................108

A. Overview.................................108

B. In General..............................108

C. Respondent's Initial Burden of Production....110

D. Analysis.................................111

VII.   Remaining Arguments..........................115

MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Respondent determined Federal income tax deficiencies and section 6662(a)[2] accuracy-related penalties as follows:

<u>Marshall and Judith Cohan, docket No. 19849-05</u>

| Year | Deficiency | Accuracy-related penalty sec. 6662(a) |
|------|-----------|---------------------------------------|
| 2001 | $1,794,445 | $358,889 |

<u>John and Janet Aldeborgh, docket No. 19854-05</u>

| Year | Deficiency | Accuracy-related penalty sec. 6662(a) |
|------|-----------|---------------------------------------|
| 2001 | $363,562 | $72,639 |

<u>Robert and Susan Hughes, docket No. 19857-05</u>

| Year | Deficiency | Accuracy-related penalty sec. 6662(a) |
|------|-----------|---------------------------------------|
| 2001 | $2,381,396 | $476,279 |

Petitioners filed petitions seeking redetermination of the deficiencies and penalties.  We consolidated the cases for trial, briefing, and opinion and shall refer to the consolidated cases as this case throughout this opinion.

---

[2]Section references are to the applicable versions of the Internal Revenue Code (Code), and Rule references are to the Tax Court Rules of Practice and Procedure.  Some dollar amounts are rounded to the nearest dollar.

After concessions by the parties, discussed infra, the issues for decision are:

(1) Whether Marshall and Judith Cohan (Marshall Cohans) and Robert and Susan Hughes (Hugheses) may each claim a charitable contribution deduction under section 170 relating to a transaction between Herring Creek Acquisition Co., L.L.C. (HCAC), and the Nature Conservancy (TNC) that occurred in 2001 (the 2001 transaction);

(2) whether petitioners failed to report taxable income from the 2001 transaction;

(3) whether the income generated by the 2001 transaction is taxable as ordinary income or as a long-term capital gain; and

(4) whether petitioners are liable for accuracy-related penalties under section 6662(a) (section 6662(a) penalties).

FINDINGS OF FACT

I. Preliminary Matters

Some facts were stipulated. We incorporate the stipulation of facts, the first supplemental stipulation of facts, and the second supplemental stipulation of facts into our findings by this reference.

Petitioners in each docket are a married couple. Benjamin and Hildegarde Cohan (Benjamin Cohans) are the parents of petitioners Marshall Cohan (Mr. Cohan) and Janet Aldeborgh, and the Benjamin Cohans are grandparents of petitioner Robert Hughes

(Mr. Hughes).  When the petitions were filed, the Marshall Cohans resided in Florida, John and Janet Aldeborgh (Aldeborghs) resided in Massachusetts, and the Hugheses resided in California.

HCAC is a Massachusetts limited liability company.  The parties stipulated that petitioners were its only members in 2001, and we so find.  HCAC redeemed the Aldeborghs' interest on October 16, 2001.  For Federal income tax purposes, HCAC reported on its Form 1065, U.S. Return of Partnership Income, for 2001, and we so find, that HCAC is a partnership not subject to the TEFRA partnership audit and litigation procedures of sections 6221 through 6234.  See sec. 301.7701-3(b)(1)(i), Proced. & Admin. Regs.

## II.  The Farm

### A.  Description

Herring Creek Farm (farm) is an approximately 220-acre property in Edgartown, Massachusetts, on the southeast shoreline of Martha's Vineyard.[3]  The farm is in a neighborhood that fronts Edgartown Great Pond on the west, Slough Cove on the north, and Crackatuxet Cove and the Atlantic Ocean on the south.

The farm sits in an ecologically significant area known as the Katama maritime sand plains.  The Katama maritime sand plains

---

[3]Martha's Vineyard is a triangular island approximately 4 miles south of Cape Cod, Massachusetts, and is surrounded by Nantucket Sound, Vineyard Sound, and the Atlantic Ocean.  The island is 97.72 square miles and has more than 150 miles of coastline.

include a rare type of soil that is found only in Martha's Vineyard, except perhaps that it may be found to a limited extent in Nantucket, and a number of natural communities such as grasslands and heathlands dominated by shrubs and oak trees. The Katama maritime sand plains also host many rare, threatened, and endangered species.

B. 1969 Agreement

One or more members of the Wallace family (Wallace family) purchased the farm from the Benjamin Cohans in 1969.[4] At that time, the Wallace family (through a trustee) entered into a December 30, 1969, agreement (1969 agreement) with the Benjamin Cohans, the Marshall Cohans, and the Aldeborghs. Hildegarde Cohan, the Marshall Cohans, and the Aldeborghs owned land adjoining the farm.

Among other things, the 1969 agreement limited development of the farm and the adjoining properties owned by the Benjamin Cohans, the Marshall Cohans, and the Aldeborghs and granted both to the Wallace family, as one party, and to the Benjamin Cohans, to the Marshall Cohans, and to the Aldeborghs, as three separate groups constituting the second party, certain rights to purchase the other party's property if it was offered for sale before January 1, 2010. The rights received by the Benjamin Cohans, the

---

[4]The Wallace family purchased and owned the farm primarily through trusts.

Marshall Cohans, and the Aldeborghs (rights of first refusal) applied to approximately 175 acres of the farm (encumbered land) and generally prevented the Wallace family from selling or transferring the encumbered land without first offering it to the Benjamin Cohans, the Marshall Cohans, the Aldeborghs, and any issue of the Benjamin Cohans or any spouse of such issue.[5]  This offer was required to be made to each of these offerees only to the extent that he, she, or they continued to own adjoining land with a dwelling thereon.  Any offer that the Wallace family made which was subject to the rights of first refusal could be accepted in the following order of priority as long as the accepting offeree (or offerees in the case of a joint acceptance by spouses) continued to own adjoining land with a dwelling thereon:  (1) Benjamin and/or Hildegarde Cohan, (2) Janet and/or John Aldeborgh, (3) Marshall and/or Judith Cohan, and (4) any issue (who is not then under a legal disability) of the Benjamin Cohans, the Marshall Cohans, or the Aldeborghs, or a spouse (who is not then under a legal disability) of that issue.  The 1969 agreement further provided that if such an offer was properly made and not timely accepted within 60 days (or was accepted within 60 days but the resulting sale was not effected pursuant to the terms of the agreement), the Wallace family could sell any

---

[5]We say "generally" because the rights of first refusal did not apply to transfers among members of the Wallace family or to any of their issue or spouses of their issue.

or all of the encumbered land to any person under any terms that the Wallace family desired (as long as the sale was timely recorded in accordance with the 1969 agreement) and that the rights of first refusal would no longer apply to that sold property.  The 1969 agreement fixed the sale price incident to the rights of first refusal at the sum of the reproduction cost of any house or other structure on the land plus an amount for the land equal to:

| Amount per acre | Termination date |
| --- | --- |
| $7,000 | Jan. 1, 1980 |
| 8,000 | Jan. 1, 1990 |
| 9,000 | Jan. 1, 2000 |
| 10,000 | Jan. 1, 2010 |

As relevant here, the rights of first refusal effectively foreclosed the possibility that the Wallace family would sell the encumbered land to an unrelated third party without the acquiescence of all of the offerees because the value of the encumbered land so significantly exceeded the set price that the rights of first refusal would be expected to be exercised.

Under the 1969 agreement the Wallace family received a reciprocal right of first refusal on the adjoining property owned by Hildegarde Cohan, the Marshall Cohans, and the Aldeborghs (reciprocal right).  The terms of the reciprocal right paralleled the terms of the rights of first refusal.  The reciprocal right, which also expired on January 1, 2010, prevented the Benjamin Cohans, the Marshall Cohans, and the Aldeborghs from selling or

transferring their property to an unrelated third party without first offering it to the Wallace family for the just-discussed price set forth in the 1969 agreement. As was similarly true in the case of the rights of first refusal, the reciprocal right did not preclude the Benjamin Cohans, the Marshall Cohans, and the Aldeborghs from transferring their property to any of their issue or to a spouse of that issue.

Under the 1969 agreement the Benjamin Cohans, the Marshall Cohans, and the Aldeborghs, and the issue of any of those persons and a spouse of the issue, also received personal rights to use a private beach (1969 beach rights). They continued to have the 1969 beach rights as long as they owned their property adjoining the farm and maintained a dwelling on that property.

III. Other Owners of Adjoining Land

In 1990 the Hugheses purchased a lot adjoining the farm. The purchase was from a family not subject to the 1969 agreement. The reciprocal right did not attach to the Hugheses' property.

In or slightly before 1995 the Aldeborghs' children and their spouses, John and Vicki Aldeborgh, Erik and Joanne Aldeborgh II, and Robert and Mary St. John (collectively, Aldeborgh children), became owners of parts of the Aldeborghs' property. The portion of the property that the Aldeborgh children received from the Aldeborghs which was subject to the 1969 agreement remained subject to that agreement.

Other residential lots adjoining the farm were owned by families not relevant to our discussion. Several of those lots fronted Edgartown Great Pond or Slough Cove. None of those lots was subject to the 1969 agreement.

IV. Formation of HCAC

The Wallace family eventually desired to develop the farm as a residential subdivision and made several attempts to do so. Petitioners were against any such development.[6] The Wallace family and petitioners disputed whether the rights of first refusal were enforceable.

On or about January 4, 1996, petitioners formed HCAC to acquire the farm and otherwise to protect the rights of first refusal against challenges by the Wallace family to the validity of the 1969 agreement. In exchange for equal partnership interests in HCAC, the Marshall Cohans and the Aldeborghs assigned their rights of first refusal to HCAC (with each of the parties to HCAC's "Operating Agreement" agreeing that the value of these rights was $25,000) and the Hugheses contributed $25,000. Later, on a date that does not appear in the record, the Aldeborgh children assigned HCAC their rights of first refusal, but they did not (and never did) receive an interest in HCAC. Mr. Hughes, a managing member of HCAC, held power of attorney to assert and defend the rights of first refusal.

---

[6]The Benjamin Cohans were both deceased as of this time.

V.  Actions Taken With Respect to the Farm

In 1996 the Wallace family filed a lawsuit against petitioners and HCAC (Wallace litigation) seeking to invalidate the 1969 agreement so that the Wallace family could develop the farm.  The Massachusetts Superior Court eventually upheld the validity of the agreement.

As of 1996 the farm consisted of a central field, an east field, various lots, and a private beach.  Improvements on the farm included, among other structures, four existing houses; i.e., two houses referred to as Blue Heron and Sanderling and two additional houses fronting Edgartown Great Pond.  The central field, so called because it was at the center of the farm, consisted of approximately 89 acres of undeveloped agricultural land and included a horse barn.  The east field comprised approximately 62 acres of undeveloped natural grassland east of the central field.  The private beach included approximately 20 acres south of Crackatuxet Cove fronting the Atlantic Ocean.

The four properties owned by the Aldeborghs and the Aldeborgh children (collectively, Aldeborgh families) were approximately 3 or 4 acres each and were on the southerly side of Crackatuxet Cove Road.  The Marshall Cohans owned an approximately 4.8-acre waterfront lot north of the central field with a 2,000-square-foot one-story home and a pool.  The Hugheses owned an approximately 1-acre lot abutting the central field with

a 1,500-square-foot Cape Cod style home. (The six properties owned by petitioners and the Aldeborgh children are collectively referred to in this opinion as petitioners' and the Aldeborgh children's existing properties.)

Mr. Hughes opposed the Wallace family's proposed development of the farm. Concerned that the Wallace family would continue advancing their development plans after the rights of first refusal expired on January 1, 2010, Mr. Hughes began seeking a buyer who was willing to purchase the farm from the Wallace family and then conserve and protect the farm.

In 2000 a realtor on Martha's Vineyard told Mr. Hughes that he had a prospective buyer, David Peters (Mr. Peters), a real estate developer with a limited liability company named MV Regency Group, L.L.C. (Regency). (Subsequent reference to Mr. Peters includes Regency.) Mr. Hughes met and talked with Mr. Peters, but Mr. Hughes eventually terminated discussions with Mr. Peters because Mr. Hughes was not satisfied with Mr. Peters' ambiguous plans for the farm.

VI. Negotiations With TNC

Around the time Mr. Hughes ended discussions with Mr. Peters, Mr. Hughes received a telephone call from Tom Chase (Mr. Chase), a program director for TNC, who told Mr. Hughes about TNC's conservation buyer program. TNC is an international conservation organization dedicated to preserving biological

diversity by protecting lands and waters that species, plants, animals, and natural communities need to survive.  TNC executes its mission by acquiring land or interests in land that may be used to manage biological diversity.  A conservation buyer is someone who acquires property subject to conservation restrictions.  At all relevant times, TNC was a section 501(c)(3) organization eligible to receive tax-deductible contributions under section 170.

TNC became interested in acquiring the farm because of its location in maritime sand plains, which exist in only a few places in the world.  TNC was familiar with the farm's location because it had worked on a nearby habitat known as the Katama Airfield.  TNC's plan for the farm involved restoring it to its natural state and then reintroducing native plant species.  In order to acquire the farm from the Wallace family, however, TNC first had to deal with the rights of first refusal.

Mr. Hughes considered TNC an attractive buyer of the farm because of TNC's commitment to preservation and conservation.  Mr. Hughes approved of TNC's plan for the farm, and HCAC and TNC began negotiating with respect to the rights of first refusal.

Nutter, McClennen & Fish, LLP (Nutter), and specifically Nutter's partners Daniel Gleason (Mr. Gleason), Joseph Shea (Mr. Shea), and Karl Fryzel (Mr. Fryzel) represented HCAC during the negotiations.  Melissa McMorrow (Ms. McMorrow), an associate at

Nutter, conducted research in connection with the 2001 transaction. Frank Giso (Mr. Giso) of Choate, Hall & Stewart, LLP (Choate), represented TNC. His partner, Kenneth Glusman (Mr. Glusman), provided tax advice to TNC.

On October 10, 2000, HCAC and TNC reached an agreement (October 2000 agreement) in which HCAC agreed to sell the rights of first refusal to TNC. In return for the rights of first refusal, HCAC would receive the following consideration from TNC: (1) Sanderling and the lot it was on (Sanderling), (2) Blue Heron and the lot it was on (Blue Heron), or alternatively a 4.9-acre lot with a house and other improvements thereon, (3) lot 2, which was an unimproved buildable lot, (4) lot 3, which was an unimproved buildable lot, (5) reimbursement of $1.6 million for legal expenses incurred during the Wallace litigation (past legal fees), (6) reimbursement for legal fees incurred in connection with the October 2000 agreement (current legal fees), (7) separate beach rights appurtenant to Blue Heron, Sanderling, lot 2, and lot 3 (collectively, four properties), respectively, and to each of petitioners' and the Aldeborgh children's existing properties (new beach rights),[7] (8) a 30-year lease, with a 30-year renewal option, for the eastern half of a horse barn on the central field (horse barn lease), (9) a 30-year lease, with a

---

[7]The new beach rights allowed the landowner to use a private portion of South Beach, which was owned by TNC.

30-year renewal option as to lot 102,[8] a 4.15-acre lot abutting the Aldeborghs' existing property (Aldeborgh lease), (10) reimbursement for certain State and Federal taxes incurred by members of HCAC (tax make-whole payment); (11) indemnification regarding any taxes, including penalties and interest, resulting from the 2001 transaction (tax indemnification); and (12) relocation of a driveway used by neighbors (Wild right-of-way relocation). Sanderling, Blue Heron, lots 2 and 3, and the leasehold interests were part of the farm, and TNC could convey them only if it acquired those properties from the Wallace family.

In the agreement, TNC also agreed to impose conservation and development restrictions (collectively, conservation restrictions) on the farm when acquired. The parties to the agreement also agreed that they would permit some limited additional development of the farm, and they specifically recognized that TNC would convey certain development rights to HCAC and to other third parties. One of the third parties to whom TNC would convey development rights was TNC's benefactor, Roger Bamford (Mr. Bamford).[9] Under the agreement Mr. Bamford

---

[8]Lot 102 is also sometimes referred to in the record as lot 32.

[9]In 2001 Mr. Bamford was a senior vice president and the principal architect of the Server Technologies Division at Oracle, a large software company. He eventually helped TNC pay

(continued...)

would receive a right, exercisable after 2020, to build a house, with certain restrictions, on a parcel of the farm.

The October 2000 agreement included a $1 million breakup fee provision that would be triggered if the parties did not close by December 22, 2000. The agreement provided that the December 22, 2000, date could be extended three times for 30 days each if, among other things, TNC deposited $50,000 per extension in an escrow account. If the parties to the agreement closed by December 22, 2000, or the extended date if applicable, the breakup fee (inclusive of the $1 million and any amount paid for an extension, with interest accrued on those funds) would be applied to the cash reimbursement for past legal fees. If the parties to the agreement did not close in time, the fee would be forfeited to HCAC. TNC initially placed $1 million in escrow to cover the breakup fee. HCAC and TNC did not close by the

---

[9](...continued)
for the farm by making gifts to TNC and by later purchasing one of the existing homes on the farm. Mr. Bamford became interested in acquiring property on Martha's Vineyard after renting a house on the farm. In 2000 Mr. Bamford met Mr. Chase, who later informed him about TNC's conservation plan for the farm, and Mr. Bamford began negotiating with TNC. On Oct. 18, 2000, TNC and Mr. Bamford agreed that Mr. Bamford would (1) lend TNC up to $40 million to finance TNC's purchase of the farm from the Wallace family, (2) lend TNC money to cover TNC's obligation to pay HCAC's legal fees and any other costs, expenses, and payments that TNC owed to HCAC, and (3) share with TNC in the tax indemnification agreement for any obligation TNC owed to HCAC over $1 million and up to $25 million. On Oct. 30, 2000, Mr. Bamford signed another indemnity agreement in which he agreed to indemnify HCAC up to $24 million for certain future risks in connection with the 2001 transaction.

December 2000 closing date because the Wallace family rejected TNC's offer to purchase the farm. TNC exercised the first of the three 30-day extensions.

In November 2000 and January 2001, the Wallace family received approval from the Martha's Vineyard Commission and from the Edgartown Planning Board, respectively, to develop the farm into a 33-lot residential subdivision. Nine and one-half of these 33 proposed lots were not subject to the rights of first refusal, and the Wallace family could have sold those nine and one-half lots, either developed or undeveloped, notwithstanding any objection from HCAC.

HCAC and TNC did not close by the end of the first extended date, and TNC exercised the second 30-day extension. TNC was continuing to negotiate with the Wallace family, and the Wallace family shortly thereafter offered to sell the farm to TNC, but only if the transaction included Mr. Peters, and later the F.A.R.M. Institute (FARM Institute). The FARM Institute is a nonprofit organization devoted to promoting and invigorating sustainable agriculture on Martha's Vineyard by engaging community participation in its operations. The FARM Institute provides a working/teaching farm where the community can participate as students in the activities and actual workings of a farm. The FARM Institute desired to purchase part of the farm to provide its programs (including growing crops and raising

animals such as beef and dairy cattle, sheep, goats, and chickens) upon it.

On January 29, 2001, TNC agreed in principal to buy the farm from the Wallace family, and the Wallace family (through a trustee) agreed in principal to sell the farm to TNC. However, the deal was not consummated before the end of the second 30-day extension period. HCAC agreed to leave the breakup fee in escrow until TNC reached a definite agreement with the Wallace family. On April 24, 2001, the Wallace family (through a trustee) and TNC reached a final agreement reflecting the sale (Wallace agreement). Mr. Bamford, Mr. Peters, and the FARM Institute were integral parts of the agreement. Mr. Peters was acting through Regency on behalf of himself and other third parties (including late-night-show host David Letterman).

The Wallace agreement allowed more development of the farm than the October 2000 agreement contemplated. The Wallace agreement let TNC transfer a total of 10 lots to HCAC and to other named parties. Mr. Peters would eventually receive 4 of those 10 lots, and Mr. Bamford would receive 2 of the 10 lots. Mr. Bamford and Mr. Peters would each have construction rights to build houses, with certain restrictions, on their lots. The FARM Institute would receive 1 of the 10 lots (i.e., a 6.75-acre lot) and a 99-year lease on the central field to operate a farm for educational purposes. The FARM Institute planned to use its

property semipublicly, operating a modest working farm on the property as an educational resource for students. The FARM Institute agreed, however, to restrict the number of students visiting its property at any given time, to limit the number of animals kept on the property, to restrict school trips during certain months, and to minimize vehicular disturbances. HCAC would receive the remaining three lots; namely, Sanderling, lot 2, and lot 3.[10]

VII. Final Agreement

Because of the additional development authorized by the Wallace agreement, TNC and HCAC had to renegotiate the October 2000 agreement. TNC and HCAC began a series of difficult and complex negotiations in which they attempted to reach an agreement regarding the additional development authorized by the Wallace agreement. At this time, Mr. Giso introduced to one of HCAC's attorneys the idea of treating and reporting the 2001 transaction as a bargain sale gift. Mr. Giso believed that a bargain sale gift would enable HCAC to claim a charitable contribution deduction to the extent that the fair market value of the rights of first refusal exceeded the fair market value of the consideration HCAC received. Mr. Giso and Mr. Birle, both on behalf of TNC, recognized that TNC would be obligated to

---

[10]Blue Heron was not a numbered lot under the limited development plan.

reimburse petitioners for any tax petitioners paid on the transfer to TNC of the rights of first refusal, and Mr. Giso and Mr. Birle aimed to structure the transaction to minimize or eliminate the amount of any such reimbursement.

On June 29, 2001, HCAC and TNC reached a final agreement (final agreement) regarding the rights of first refusal. In the final agreement, HCAC agreed to convey the rights of first refusal to TNC for the following: (1) The four properties, (2) the horse barn lease, (3) the Aldeborgh lease, (4) a conditional option to acquire lot 29 (the lot 29 option),[11] (5) the Wild right-of-way relocation, (6) new beach rights, (7) past and current legal fees (as modified below), (8) a tax make-whole payment, and (9) tax indemnification.

The final agreement was like the October 2000 agreement but contained some notable differences. First, the final agreement included the following clause:

> WHEREAS, the LLC has expressed the willingness to make a bargain sale gift to TNC of the appraised fair market value of the 1969 Agreement in excess of the value of the cash and real estate conveyances expressly described below in this Agreement.

The final agreement further provided that any tax savings resulting from a charitable contribution deduction for HCAC would benefit TNC by reducing the tax make-whole payment that TNC owed HCAC. Second, it gave HCAC the lot 29 option. Third, it

---

[11]The record sometimes refers to lot 29 as "lot 99".

increased the current and past legal fees reimbursement.  The October 2000 agreement required TNC to pay the first $250,000 of HCAC's current legal fees and 50 percent of the excess and to reimburse HCAC $1.6 million for past legal fees.  The final agreement required TNC to pay the first $325,000 of HCAC's current legal fees and 50 percent of the excess and to reimburse HCAC for past legal fees of $1.7 million.

Shortly after HCAC and TNC reached the final agreement, Mr. Hughes asked Thomas Wallace (Mr. Wallace) of Wallace & Co., Inc., to value the consideration that HCAC was to receive under the final agreement.  On July 16, 2001, Mr. Wallace issued his opinion (Wallace letter) regarding the value of the consideration as follows:

| Property | Fair market value |
|----------|-------------------|
| Blue Heron[1] | $1,000,000 |
| Sanderling[1] | 2,400,000 |
| Lot 2[1] | 1,100,000 |
| Lot 3[1] | 1,300,000 |
| Lot 29 option | 100,000 |
| Horse barn lease | 500,000 |
| Aldeborgh lease | 450,000 |
| Eight beach rights[2] | 3,200,000 |
| Total | 10,050,000 |

[1]Mr. Wallace's valuations of Blue Heron and Sanderling included the new beach rights that attached thereto, while his valuations of lots 2 and 3 excluded them. The valuations of these four properties excluded any increase in value associated with the conservation restrictions.

[2]The eight beach rights included the six new beach rights that attached to petitioners' and the Aldeborgh children's existing properties and the two new beach rights that attached to lots 2 and 3.

Mr. Wallace also opined on several other aspects of the 2001 transaction. He estimated the conservation restrictions added between $750,000 and $2 million to the value of each lot abutting the property on which the conservation restrictions were placed. Mr. Wallace valued the Wild right-of-way relocation between $200,000 and $300,000 and a private way relocation and closure between $100,000 and $300,000. Finally, he opined that the nondevelopment of lot 102, the lot subject to the Aldeborgh lease, would increase the value of the abutting lots, which included the Aldeborghs' existing property, by an additional 10 to 20 percent of the increase in value from the conservation restrictions.

After the parties began focusing on the value of the consideration, Mr. Shea insisted that TNC establish an escrow account to fund the tax make-whole payment and to deposit funds into it before the closing. After several days of negotiating, Mr. Shea told Mr. Giso that $3,299,000 would be sufficient to cover the tax liability from the 2001 transaction, and TNC deposited that amount into the escrow account before the closing date.

VIII.  The Closing

A.  Overview

The 2001 transaction closed on July 20, 2001.[12] The following actions occurred during the closing:  (1) TNC executed documents imposing conservation restrictions on the farm, including the four properties; (2) HCAC, petitioners, the Aldeborgh children, and TNC executed an agreement, "Assignment and Assumption of 1969 Agreement (HCAC ET AL. TO TNC)", in which HCAC transferred the rights under the 1969 agreement, including the rights of first refusal, to TNC;[13] (3) TNC executed a document terminating the rights under the 1969 agreement; and (4) TNC executed various deeds and leases conveying portions of the

---

[12]At the same time, and incident thereto, the Wallace family sold the farm to TNC for a deeded price of approximately $64 million.

[13]The parties agree that the fair market value of the rights of first refusal was then $14 million.

farm (including the four properties then subject to the restrictions imposed by TNC) in accordance with the final agreement.[14]

B.  Four Properties Transferred to HCAC

1.  Blue Heron

Blue Heron is at 7 Butler's Cove Rd. (on the corner of Slough Cove Rd. and Butler's Cove Rd.), adjacent to the FARM Institute's property.  Blue Heron consists of 1.9 acres of land north of the central field and a small 1,608-square-foot two-story house that is approximately 200 years old.  The first floor of the house has a kitchen, dining room, breakfast nook, bedroom, television room, and bathroom.  The second floor has three bedrooms and a bathroom.  The house has two broken fireplaces and a full basement.  Blue Heron is not waterfront property, but it has deeded private beach rights as a result of the 2001 transaction.

2.  Sanderling

Sanderling, at 19 Butler's Cove Rd., consists of 3.9 acres of land north of the central field and an 1,826-square-foot two-story house which is approximately 200 years old.  The house's first floor includes a kitchen, a dining room, a living

---

[14]The final agreement provided that TNC would convey to HCAC a quitclaim deed for Sanderling and for lots 2 and 3 and an option to purchase Blue Heron for $1 exercisable from Sept. 15, 2001, for consideration of $1.  On Feb. 7, 2002, HCAC exercised the option to acquire Blue Heron.

room, two bedrooms, and a bath. The second floor has two bedrooms and a bath. The house has a full basement and an attached one-car garage. Its exterior is wood shingle siding. Sanderling is not waterfront property, but it has deeded private beach rights as a result of the 2001 transaction.

### 3. Lots 2 and 3

Lots 2 and 3 are waterfront lots north of the central field on Butler's Cove Rd. The respective lots are undeveloped 3.14- and 3-acre lots on Slough Cove and have approximately the same footage fronting Edgartown Great Pond. Both lots are approved for the building of a single-family residence. The topography of each lot is relatively flat, so the gradient of the land does not obstruct the view of the central field from the envelopes of the lots. Each lot includes deeded private beach rights as a result of the 2001 transaction. Lot 2 is adjacent to the FARM Institute property.

### C. Horse Barn Lease

On July 20, 2001, as part of the 2001 transaction, TNC leased to HCAC half of the horse barn on the central field for 30 years with a 30-year renewal option. The horse barn lease requires HCAC to pay rent of $1 per year. The horse barn lease has two elements.

The first element of the horse barn lease is the right to use the eastern half of the horse barn to stable up to eight

horses, for personal storage, and for related and incidental uses. The horse barn is approximately 6,000 square feet; and when the lease was executed, and as of the appraisal date, the eastern half of the horse barn had no stalls. The lease does not preclude the lessee from erecting stalls in the eastern half of the horse barn.

The second element of the horse barn lease is the right to use part of the grazing and paddock area adjacent to the barn for grazing and for exercising HCAC's horses. Under the lease, HCAC may use a fraction of the grazing and paddock area equal to the number of its horses stabled in the horse barn (up to 8) over the total horses stabled (up to 24). At full capacity, therefore, HCAC may not use more than 33 percent of the grazing and paddock area (8/24 = 33 percent). The horse barn lease does not indicate the size of the grazing and paddock area as it existed in 2001, but it provides that TNC may relocate the horse barn and the grazing and paddock area and that the relocated grazing and paddock area may not exceed 6.5 acres.

D. Aldeborgh Lease

On July 20, 2001, as part of the 2001 transaction, TNC leased lot 102 to HCAC for 30 years with a 30-year renewal option. The Aldeborgh lease requires HCAC to pay rent of $1 per year. The Aldeborgh lease allows HCAC to construct a "barn", not to exceed 1,500 square feet, on a 10,000-square-foot building

envelope within the ground leased premises.[15]  The Aldeborgh lease defines the ground leased premises to include lot 102 and access and egress on the existing driveway.

The Aldeborgh lease provides that the ground leased premises shall be used for construction, repair, replacement, and use of a barn for personal property storage and for related and incidental uses.  The Aldeborgh lease provides that HCAC has a right to quiet enjoyment over the ground leased premises and assumes responsibility for all real and personal property taxes, maintenance, and improvements on the ground leased premises.

E.  Lot 29 Option

TNC granted HCAC the lot 29 option as part of the 2001 transaction.  Lot 29 is a 4.02-acre lot that abuts the Hugheses' property and is subject to the conservation restrictions.

The Hugheses' property does not meet the minimum size that Edgartown's zoning ordinances require for building a residence, but their property and lot 29 together exceed the required minimum lot size.  The lot 29 option allows HCAC to acquire lot 29 for $1 to rebuild the Hugheses' home if the Hugheses' home were destroyed or became uninhabitable and their property did not meet the required minimum lot size.  The parties stipulated that in 2001 the fair market value of the lot 29 option was $4,000.

---

[15]We note that there are 43,560 square feet in an acre.

F.   Wild Right-of-Way Relocation and Other Road Modifications

As part of the 2001 transaction, TNC agreed to relocate a driveway (Wild driveway) at the demand of HCAC.  Many years ago, Mr. Cohan purchased a 20-foot strip of land from Mr. Wild, the owner of the adjacent property.  At that time, Mr. Wild had a right-of-way that he and his family used to access their property (Wild right-of-way).  The Wild right-of-way intersected the Marshall Cohans' property and Sanderling and was used by four property owners, including the Marshall Cohans.

In October 2002 the Wild driveway was relocated at a cost of $3,751.  Afterwards, Mr. Wild and his family no longer used the Marshall Cohans' property to access their property.  The contractor billed TNC for the cost of the Wild right-of-way relocation.

In addition to the relocation of the Wild driveway, TNC agreed to pay up to $100,000 for modifications of several other driveways and roads, including a partial closure of Great Plains Way near the Aldeborghs' property and a partial relocation of Butler's Neck Road near the Hugheses' property.

G.   New Beach Rights

As part of the 2001 transaction, TNC conveyed to HCAC separate private beach rights that attached to each of petitioners' and the Aldeborgh children's existing properties. TNC also conveyed separate private beach rights that attached to

each of the four properties. These 10 sets of private beach rights, i.e., the new beach rights, could be transferred only with the lots to which they were attached. The new beach rights are in addition to the personal beach rights described in the 1969 agreement.

### H. Release of the Reciprocal Right

On July 20, 2001, as part of the 2001 transaction, TNC released the reciprocal right in full. The release allowed the Marshall Cohans and the Aldeborgh families to sell or transfer their existing properties to any third party without first having to offer the properties to the Wallace family for the price fixed in the 1969 agreement. The parties agree that the fair market value of the release of the reciprocal right was $1,155,450 as of July 20, 2001.

### I. Land Bank Fees

As part of the 2001 transaction, TNC paid to the Martha's Vineyard Land Bank Commission, on behalf of HCAC, $127,500 of land bank fees due on the transfer of the four properties. Martha's Vineyard land bank fees are transfer fees imposed on the purchaser of real property on Martha's Vineyard. TNC paid $10,000 of the $127,500 in 2001 and the rest in 2002.

### J. Legal Fees Reimbursement

As part of the 2001 transaction, TNC reimbursed HCAC $1.7 million for past legal fees and $402,755 for current legal fees.

IX.  Postclosing Negotiations

Robert P. LaPorte, Jr., CRE, MAI (Mr. LaPorte),[16] agreed with TNC to provide his appraisal services in connection with the 2001 transaction.  On August 10, 2001, Mr. Gleason faxed to Mr. LaPorte (with copies to Mr. Hughes and to Erik Aldeborgh II) a letter identifying items in addition to the four properties that Mr. LaPorte should consider in his appraisal of the consideration that HCAC received from TNC (Mr. Gleason's request).  The items were:  (1) The new beach rights; (2) the horse barn lease and the Aldeborgh lease; (3) enhancements from the conservation restrictions to the values of petitioners' and the Aldeborgh children's existing properties and to the values of the four properties; (4) closure and relocation of a road; and (5) an easement to cross central field on foot or by bicycle.  On August 15, 2001, after Mr. Gleason discussed the matter with Mr. LaPorte, Mr. Gleason hand-delivered to Mr. LaPorte a followup letter (followup letter) requesting an opinion on the impact of the release of the reciprocal right on the value of the Marshall Cohans' and the Aldeborgh families' existing properties and

[16]The designation "CRE" means "Counselor of Real Estate". The designation "MAI" is awarded to qualifying members of the Appraisal Institute (the body that resulted from the merger of the American Institute of Real Estate Appraisers and the Society of Real Estate Appraisers) and is viewed as the most highly regarded appraisal designation within the real estate appraisal community.  See Schwartz v. Commissioner, T.C. Memo. 2008-117, affd. 348 Fed. Appx. 806 (3d Cir. 2009); Estate of Auker v. Commissioner, T.C. Memo. 1998-185.

enclosing a map showing the locations of those properties, the Hugheses' property, the Aldeborgh lease, and a roadway relocation.  Mr. Gleason noted in the letter that Mr. LaPorte was traveling to Martha's Vineyard the next day and asked that the two meet one day later "before a draft of your report is circulated".  On August 16, 2001, Mr. LaPorte faxed Mr. Gleason's request and followup letter to Mr. Giso.

By letters dated August 24, 2001, addressed to Hans Birle (Mr. Birle), TNC's deputy general counsel, Mr. LaPorte opined that the items TNC asked him to appraise had the following fair market values:

| Property | Fair market value |
|----------|-------------------|
| Blue Heron | $625,000 |
| Sanderling | 1,000,000 |
| Lot 2 | 2,250,000 |
| Lot 3 | 2,500,000 |
| New beach rights[1] | 750,000 |
| Reciprocal right | 1,220,000 |
| Total | 8,345,000 |

[1]These new beach rights pertain only to the six existing properties owned by petitioners and the Aldeborgh children.

Mr. LaPorte did not contemporaneously appraise the other items identified in Mr. Gleason's request.[17]

After Mr. LaPorte issued his appraisal reports, TNC's and HCAC's attorneys continued negotiating the perceived bargain sale

[17]Mr. LaPorte, at petitioners' request, appraised the horse barn lease, the Aldeborgh lease, and the roadway relocations after this litigation commenced.

gift component of the final agreement.  They exchanged a series of communications on that subject and particularly the tax make-whole payment.  On September 14, 2001, Mr. Giso hand-delivered to Mr. Gleason a letter stating that Mr. Fryzel is "having some trouble with the notion that HCAC should report a bargain sale gift in connection with this transaction."  Mr. Giso reminded Mr. Gleason that TNC's tax indemnification obligation continued through the later of the closing of an audit of the transaction or the closing of the period in which to audit the transaction and that this obligation was secured by the funds placed in escrow.  HCAC's and TNC's attorneys estimated petitioners' tax liability resulting from the 2001 transaction, and they agreed that the tax make-whole payment was $1,484,000 "based on current facts and circumstances".  They also agreed that the indemnification provisions continued in full force and effect in the event of a Federal or a State tax audit.

On December 21, 2001, HCAC and TNC executed an "Agreement Regarding Bargain Sale Gift and Tax Payments" (bargain sale gift agreement).  They calculated in the bargain sale gift agreement that the bargain sale gift amount was as follows:

```
Value of rights of first refusal                          $14,000,000
Less: Consideration received
  Four properties                         $6,375,000
  Cash payments to or on behalf of HCAC[1]  2,102,755
  Beach rights/enhancements                  750,000
  Release of reciprocal right             1,220,000
  Tax make-whole payment                  1,484,000   11,931,755
    Bargain sale gift amount                            2,068,245
```

[1]These payments included past legal fees of $1.7 million and current legal fees of $402,755.

HCAC and TNC used Mr. LaPorte's August 24, 2001, appraisals and the currently agreed amount of the tax make-whole payment to calculate the bargain sale gift amount.[18] The bargain sale gift agreement required that HCAC report the gain on the transfer to TNC of the rights of first refusal as long-term capital gain for tax purposes.

On or around March 8, 2002, Dennis Wolkoff (Mr. Wolkoff), a TNC vice president and its director of conservation real estate for the eastern region, sent HCAC a letter (gift letter) related to the 2001 transaction. The gift letter, which was reviewed by Mr. Birle and by Mr. Wolkoff, stated that the difference between the value of the rights of first refusal and the value of the consideration received represented a bargain sale gift to TNC. The gift letter stated that HCAC received $11,931,755 in

[18]Petitioners now concede that the following items of consideration HCAC received in the 2001 transaction should have been (but were not) included in the calculation of the bargain sale gift amount: (1) The horse barn lease, (2) the Aldeborgh lease, (3) the Wild right-of-way relocation, (4) the lot 29 option, and (5) the land bank fees paid during 2001 and 2002.

consideration for the rights of first refusal and included the following calculation:

| | |
|---|---|
| Four properties | $6,375,000 |
| Cash payments to or on behalf of HCAC | 3,586,755 |
| Beach rights/enhancements | 750,000 |
| Release of reciprocal right | 1,220,000 |
| Total | 11,931,755 |

The letter stated that but for this $11,931,755 of consideration, "No other goods or services were provided by TNC to HCAC in connection with this transaction." The statement of the value of consideration reported in the gift letter came directly from the bargain sale gift agreement.

X. Federal Income Tax Reporting

Steven Ridgeway (Mr. Ridgeway) is a certified public accountant who was HCAC's accountant and tax return preparer for its 2001 taxable year. On or around January 30, 2002, Mr. Ridgeway faxed to Mr. Hughes a letter describing petitioners' reporting positions regarding HCAC.

HCAC reported on its 2001 return that the transfer of the rights of first refusal was a bargain sale gift. With respect to the gift, HCAC claimed a charitable contribution deduction of $2,068,245, which represented the bargain sale gift amount calculated in the gift letter and in the bargain sale gift agreement. With respect to the sale, HCAC reported a net long-term capital gain of $9,136,593 calculated as follows:

| Four properties | $6,375,000 |
|---|---|
| Cash payments for current and past legal fees | 2,102,755 |
| Tax make-whole payment | 1,484,000 |
| Total sale price | 9,961,755 |
| Basis in the rights of first refusal | (825,162) |
| Long-term capital gain | 9,136,593 |

The $825,162 basis that HCAC reported for the rights of first refusal included: (1) $728,963 of fees paid to Nutter in 2001, (2) $404 in bookkeeping and accounting expenses, (3) $41,627 paid to Horsley & Witten, Inc. (Horsley & Witten), for environmental studies, (4) $35,000 paid to Wallace & Co., and (5) $19,169 paid to the Private Merchant Banking Co. (PMBC).[19] Mr. Hughes paid all of those expenses from his personal account, except for the PMBC expense, which HCAC paid from its account. The Nutter fees represent: (1) $566,030 of capital expenditures includable in the basis of the rights of first refusal, (2) $36,662 for tax advice, (3) a $100,000 "success fee" for which there was no written contract (this "fee" was paid pursuant to an oral agreement between Mr. Hughes and Nutter, and the amount thereof was not set until after the 2001 transaction), (4) $6,000 in section 212 expenses of HCAC, (5) $6,607 in section 212

---

[19]Although HCAC reported a basis of $825,162 on its return, the underlying expenditures that the parties stipulated HCAC claimed on its return actually totaled $825,163.

expenses of the Marshall Cohans, and (6) $13,664 of nondeductible personal expenditures.[20]

HCAC issued to each couple a Schedule K-1 (Form 1065), Partner's Share of Income, Credits, Deductions, etc., for 2001 reflecting that couple's share of long-term capital gain and charitable contribution deduction as follows:

| Petitioners | Long-term capital gain | Charitable contribution deduction |
|---|---|---|
| Hugheses | $4,881,399 | $1,034,123 |
| Marshall Cohans | 3,416,195 | 1,034,123 |
| Aldeborghs | 839,000 | -0- |

On their 2001 Federal income tax returns, petitioners reported the amounts shown on their respective Schedules K-1.  The Marshall Cohans attached the gift letter to their 2001 Federal income tax return to substantiate their claimed charitable contribution deduction resulting from the 2001 transaction.  The Hugheses did not do similarly.

XI.  Notices of Deficiency

By notices of deficiency, respondent (1) disallowed the charitable contribution deductions that HCAC, the Hugheses, and the Marshall Cohans claimed with respect to the 2001 transaction,

--------

[20]Sec. 212 generally authorizes a deduction for ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income; for the management, conservation, or maintenance of property held for the production of income; or in connection with the determination, collection, or refund of any tax.

(2) determined that HCAC and petitioners had realized $15,381,755 of ordinary income on HCAC's "conveyance" to TNC of the rights of first refusal, instead of the reported $9,136,593 net capital gain,[21] and (3) determined that each couple was liable for a section 6662(a) penalty.  Respondent did not include in the notices of deficiency an explanation of how he calculated the $15,381,755 of ordinary income (or alternatively net long-term capital gain).  We infer from the record, however, that the consideration and the value of that consideration included in calculating the $15,381,755 (and the parties' positions with respect thereto) are as follows:

---

[21]Respondent determined alternatively that HCAC's net long-term capital gain was $15,381,755, rather than $9,136,593 as reported, because HCAC failed to report certain consideration it received in the 2001 transaction and did not establish its reported basis of $825,162.

| Consideration | HCAC's tax return | Notices of deficiency | Respondent's trial position | Petitioners' trial position |
|---|---|---|---|---|
| Blue Heron | $625,000 | $625,000 | [1]$915,000 | $625,000 |
| Sanderling | 1,000,000 | 1,000,000 | [2]1,400,000 | 1,000,000 |
| Lot 2 | 2,250,000 | 2,250,000 | [3]2,900,000 | 2,250,000 |
| Lot 3 | 2,500,000 | 2,500,000 | [4]3,200,000 | 2,500,000 |
| Tax make-whole payment | 1,484,000 | 1,484,000 | 1,484,000 | 1,484,000 |
| Past legal fees | 1,700,000 | 1,700,000 | 1,700,000 | 1,700,000 |
| Current legal fees | 402,755 | 402,755 | 402,755 | 402,755 |
| New beach rights received as to the existing properties | -0- | 2,400,000 | 1,400,000 | -0- |
| Reciprocal right | -0- | 1,220,000 | 1,155,450 | -0- |
| New beach rights received as to the existing properties as initially valued by Mr. Laporte on Aug. 24, 2001[5] | -0- | 750,000 | -0- | -0- |
| Horse barn lease | -0- | 500,000 | 120,000 | 54,000 |
| Aldeborgh lease | -0- | 450,000 | 85,000 | 18,000 |
| Lot 29 option | -0- | 100,000 | 4,000 | 4,000 |
| Wild right of way relocation | -0- | -0- | 3,751 | -0- |
| Land bank fees | -0- | -0- | 10,000 | 10,000 |
| Total | 9,961,755 | 15,381,755 | 14,779,956 | 10,047,755 |

[1]Includes $650,000 of value (before consideration of any value for the conservation restrictions included in the 2001 transaction or for the new beach rights), $65,000 of value from the imposition of the conservation restrictions on July 20, 2001, and $200,000 of value for the new beach rights received in the 2001 transaction as to Blue Heron.

[2]Includes $1 million of value (before consideration of any value for the conservation restrictions included in the 2001 transaction or for the new beach rights), $200,000 of value from the imposition of the conservation restrictions on July 20, 2001, and $200,000 of value for the new beach rights received in the 2001 transaction as to Sanderling.

[3]Includes $2.25 million of value (before consideration of any value for the conservation restrictions included in the 2001 transaction or for the new beach rights), $450,000 of value from the imposition of the conservation restrictions on July 20, 2001, and $200,000 of value for the new beach rights received in the 2001 transaction as to lot 2.

[4]Includes $2.5 million of value (before consideration of any value for the conservation restrictions included in the 2001 transaction or for the new beach rights), $500,000 of value from the imposition of the conservation restrictions on July 20, 2001, and $200,000 of value for the new beach rights received in the 2001 transaction as to lot 3.

[5]These new beach rights were also valued in the Wallace letter dated July 16, 2001, at $400,000 apiece (or a total of $2.4 million).

OPINION

I.  Burden of Proof

A taxpayer generally has the burden of proving that the Commissioner's determination is in error.  Rule 142(a)(1).  If, however, a taxpayer produces credible evidence with respect to one or more factual issues relevant to ascertaining the taxpayer's Federal income, estate, or gift tax liability, the burden of proof may shift to the Secretary[22] as to that issue (or those issues).  See sec. 7491(a)(1).  The burden of proof will shift to the Secretary if the taxpayer meets the following requirements of section 7491(a)(2):  (1) The taxpayer substantiates any item as required by the Code, (2) the taxpayer maintains all records required by the Code, and (3) the taxpayer cooperates with the Secretary's reasonable requests for witnesses, information, documents, meetings, and interviews.  Section 7491(a)(2)(C) also provides that, in order to shift the burden of proof, a taxpayer that is a partnership, a corporation, or a trust (other than a qualified revocable trust as defined in section 645(b)(1)) must meet the requirements of section 7430(c)(4)(A)(ii) (which in turn references the net-worth requirements of 28 U.S.C. sec. 2412(d)(2)).

---

[22]The term "Secretary" means the Secretary of the Treasury or his delegate.  Sec. 7701(a)(11).

Petitioners do not contend that section 7491(a)(1) applies. In addition, petitioners have not established that they satisfied the requirements of section 7491(a)(2). We hold that section 7491(a)(1) does not apply to shift the burden of proof to respondent. See Goosen v. Commissioner, 136 T.C. 547, 558 (2011); Stipe v. Commissioner, T.C. Memo. 2011-92.

Petitioners make one argument as to which party bears the burden of proof with respect to the deficiencies. Specifically, they argue that respondent must prove that their properties were enhanced in value through the conservation restrictions arising from the 2001 transaction in determining the amount of any charitable contribution deduction resulting from that transaction. We need not and do not address that argument because we hold infra that petitioners failed to meet the requirements under section 170(f)(8) for any charitable contribution deduction as to the 2001 transaction.

II. Charitable Contribution Deductions

A. Background

We now decide whether petitioners have proven that respondent erroneously disallowed the charitable contribution deductions claimed under section 170 in connection with the 2001 transaction. HCAC allocated HCAC's claimed charitable contribution deduction one-half to the Hugheses and one-half to

the Marshall Cohans.  Each couple deducted the amounts allocated to them.

B.  Section 170 and Regulations

Section 170(a)(1) authorizes a deduction for charitable contributions paid within a taxable year to or for the use of organizations described in section 170(c).  However, a taxpayer may not deduct any charitable contribution of $250 or more unless the taxpayer substantiates the contribution with a contemporaneous written acknowledgment from the charitable organization.  Sec. 170(f)(8)(A).  The written acknowledgment generally must include the following three things:  (1) The amount of cash paid and a description (but not the value) of any property other than cash contributed; (2) whether the donee organization provided any goods or services in consideration for the cash or property contributed; and (3) a description and good-faith estimate of the value of any goods or services provided by the donee organization.  Sec. 170(f)(8)(B).  A written acknowledgment is contemporaneous if the taxpayer obtains the acknowledgment on or before the earlier of the date on which the taxpayer files a return for the taxable year in which the contribution was made, or the due date (including extensions) for filing such return.  Sec. 170(f)(8)(C).

A charitable organization provides goods or services in consideration for a taxpayer's payment if, at the time the taxpayer makes the payment to the donee organization, the taxpayer receives or expects to receive goods or services in exchange for that payment. Sec. 1.170A-13(f)(6), Income Tax Regs. Goods or services generally include cash, property, services, benefits, and privileges, and goods or services provided in a year other than the year in which the taxpayer makes the payment.[23] Sec. 1.170A-13(f)(5), (6), (8), Income Tax Regs. A good-faith estimate means the donee organization's estimate of the fair market value of the goods and services provided, without regard to the manner in which the organization made the estimate. Sec. 1.170A-13(f)(7), Income Tax Regs.

A taxpayer may rely on a contemporaneous written acknowledgment for the fair market value of any goods or services provided to the taxpayer by the charitable organization. Sec. 1.170A-1(h)(4)(i), Income Tax Regs. However, a taxpayer may not use a charitable organization's estimate of the value of goods or services as the fair market value if the taxpayer knows, or has reason to know, that the estimate is unreasonable. Sec. 1.170A-1(h)(4)(ii), Income Tax Regs.

---

[23]Certain goods or services may be disregarded for purposes of sec. 170(f)(8). Sec. 1.170A-13(f)(8), Income Tax Regs. None of the exclusions applies here.

C. <u>Analysis</u>

HCAC received from TNC the gift letter describing the rights of first refusal that HCAC transferred to TNC and disclosing some of the items of consideration, and their estimated values, that HCAC received in return. TNC, however, did not disclose in the gift letter several items of consideration, including the horse barn lease, the Aldeborgh lease, the Wild right-of-way relocation, the lot 29 option, and the land bank fees paid on behalf of HCAC. That nondisclosure, according to respondent, precludes HCAC and petitioners from claiming a charitable contribution deduction because HCAC did not receive an adequate written acknowledgment as required under section 170(f)(8).[24] Petitioners concede that HCAC received the omitted items of consideration from TNC and that the omitted items were erroneously excluded from the gift letter.

We must decide whether the gift letter included a good-faith estimate of the value of the consideration that HCAC received in the 2001 transaction and whether HCAC, the Hugheses, or the Marshall Cohans reasonably relied on that letter to claim their charitable contribution deductions under section 170. We decide both inquiries in the negative.

---

[24]Respondent also contends that the gift letter is deficient because Mr. LaPorte's appraisals of the four properties did not account for the conservation restrictions. As discussed <u>infra</u>, we conclude that Mr. LaPorte accounted for those restrictions in his appraisals.

1. Good-Faith Estimate

The Court has previously held that a taxpayer did not satisfy the requirements under section 170(f)(8) when consideration the taxpayer received was not disclosed in the acknowledgment.  See, e.g., Addis v. Commissioner, 118 T.C. 528 (2002), affd. 374 F.3d 881 (9th Cir. 2004).  In Addis, the taxpayers claimed a charitable contribution deduction for payments to a charitable organization, which in turn used the payments to pay premiums on a charitable split-dollar life insurance policy for one of the taxpayers.  Id. at 529.  The policy provided that a percentage of death benefits would go to the charity and the rest to the taxpayers' family trust.  Id. The taxpayers reserved the right to borrow on or to surrender the policy.  Id. at 532.  The taxpayers did not require that the charity use the payments for the premiums but expected it to do so.  Id. at 531.  The taxpayers received a receipt from the charity stating that the charity provided no goods or services for the payments.  Id.

We analyzed whether the receipt satisfied the substantiation requirements under section 170(f)(8).  We first concluded that the taxpayers received from the charity the right to receive a percentage of the death benefits on the insurance policy and that the right constituted consideration.  Id. at 535-536.  We then concluded that the charity's failure to disclose the

consideration in the receipt meant that the charity also failed to make a good-faith estimate of the value of the benefit it gave to the taxpayers. Id. at 536-537. We noted that the failure to disclose the consideration was in the interest of both the taxpayers and the charity. Id. We disallowed the entire charitable contribution deduction, stating that the written acknowledgment did not include a good-faith estimate of the benefits the taxpayers received and that the taxpayers "unquestioningly and self-servingly" used that erroneous acknowledgment to claim their charitable contribution deduction. Id.

The Court of Appeals for the Ninth Circuit affirmed our disallowance of the entire deduction. See Addis v. Commissioner, 374 F.3d at 887. The court emphasized that section 170(f)(8) is important to the effective administration of our self-reporting tax system and that "'the Government depends upon the good faith and integrity of each potential taxpayer to disclose honestly all information relevant to tax liability.'" Id. at 884, 887 (quoting United States v. Bisceglia, 420 U.S. 141, 145 (1975)). The taxpayers argued that they were entitled to rely on the receipt and that the goods and services did not have to be disclosed because they were insubstantial. The court disagreed. Id. at 887. The court stated that the taxpayers had reason to know that the receipt was wrong because they were privy to all

the details of the arrangement and that the taxpayers had reason
to know that the consideration they expected was substantial.
Id.

The Addis case is instructive to our decision here.  TNC
aspired to structure the 2001 transaction to minimize or to
eliminate the portion of petitioners' tax liabilities that TNC
agreed to pay, and TNC (through its officers and attorneys) knew
that any decrease in the value of consideration that HCAC
received would reduce those liabilities.[25]  In addition, after
the transaction was structured, TNC had an incentive to exclude
from the gift letter part of the consideration that TNC received
because the less consideration disclosed in the gift letter, the
more the gift letter would on its face support the reporting of a
greater charitable contribution deduction (and thus lesser
reimbursement).

---

[25]TNC's incentive was expressed in the final agreement as
follows:

> if it is determined that there is in fact a bargain
> sale gift being made by the LLC [HCAC] to TNC, then in
> determining the amount of a tax liability for which TNC
> is responsible hereunder, the tax savings from any
> charitable deductions * * * which are credited to the
> LLC as a result of such bargain sale gift shall be
> netted against any of the tax liabilities which may
> have been created by any of the other components of
> this transaction in order to determine the ultimate net
> tax liability for which TNC is responsible to indemnify
> the LLC.

The postclosing negotiations illustrated the parties' intentions regarding the gift letter. They focused primarily on drafting the bargain sale gift agreement, on which TNC based the gift letter, and the attorneys for TNC and HCAC actively negotiated the details and the contents of the bargain sale gift agreement (and hence the gift letter) with TNC's goal in mind. To be sure, Mr. Hughes described the bargain sale gift agreement as a "highly negotiated instrument" that involved "a lot of back and forth with the appraiser", and the following two examples illustrate TNC's and HCAC's negotiations on the contents of that agreement. First, on October 23, 2001, Mr. Giso sent Mr. Birle an October 23, 2001, memorandum with attached charts depicting TNC's and HCAC's preliminary and final calculations of the bargain sale gift amount. TNC's and HCAC's calculations are different because TNC and HCAC assigned different values to the new beach rights, the release of the reciprocal right, the tax make-whole payment, and the enhancement to petitioners' existing property (TNC and HCAC disputed whether the enhancement should be taken into account at all). Second, on November 26, 2001, Mr. Bamford, who had a stake in the tax make-whole payment because he agreed to give TNC the money to cover petitioners' tax liabilities resulting from the 2001 transaction, sent an email to Mr. Giso, which was forwarded to Mr. Gleason. The email stated:

> Rob [Hughes] said that after we agree on a cash payout, he'd try to increase the gift. I impressed upon him

that unless we benefited somehow we would not be supportive in reducing the $10,450,000 that is used to derive the gift value, so we agreed that we'd get $.17 credited against the TMW [tax make-whole] payment for every $1 that land value, legal fees, beach rights, and preemptive rights are reduced.

* * * * * * *

When they reevaluated their appraised values of those various categories, with the intent of coming up with a statement that TNC signs off on for the gift value, any reduction in the $10,450,000 is multiplied by .17, that amount is given to TNC, and the remainder of the escrow account goes to HCAC.

Both Mr. Giso's memorandum and Mr. Bamford's email illustrate that TNC and HCAC negotiated which items of consideration, and the value of that consideration, to include in the bargain sale gift agreement (and hence in the gift letter).

In addition, the attorneys for TNC and for HCAC were intimately aware of the specific items of consideration that HCAC received, and they were actively involved with Mr. LaPorte in his appraisal assignment, including Mr. Gleason's dictating to Mr. LaPorte the items that he needed to appraise as consideration that HCAC received for the transfer to TNC of the rights of first refusal. While Mr. LaPorte was preparing his appraisal of the rights of first refusal and other items of consideration, Mr. LaPorte received a copy of Mr. Gleason's request which asked Mr. LaPorte to consider, among other things, the omitted items. Mr.

LaPorte also received a copy of Mr. Gleason's followup letter.[26] Mr. LaPorte faxed Mr. Gleason's request and followup letter to Mr. Giso. Mr. Giso's only explanation for omitting the Aldeborgh lease and driveway relocations was that they "just fell off the radar screen". He also explained that he assumed the lot 2 and 3 appraisals included the value of the horse barn.[27] Although Mr. Giso testified that his confusion resulted from the complexity of the negotiations, we do not find Mr. Giso's explanation on this point to be credible and we decline to rely upon it. See Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 84-87 (2000), affd. 299 F.3d 221 (3d Cir. 2002).

Mr. Wolkoff, who signed the final gift letter, and Mr. Birle, who signed an earlier draft of the gift letter, also were unable to explain the inadequacies in the gift letter.[28] Both

---

[26]The record does not specifically show why Mr. LaPorte ignored those items after receiving Mr. Gleason's request and followup letter. The evidence, however, suggests that Mr. LaPorte may have been instructed to do so. Mr. LaPorte participated in several teleconferences with Mr. Giso and Mr. Gleason regarding "Cohan/Aldeborgh appraisals" within days after Mr. LaPorte faxed to Mr. Giso a copy of Mr. Gleason's request and followup letter. Although the substance of those conversations is not clear from the record, the series of teleconferences after Mr. Giso received a copy of those letters indicates that some discussion likely involved the content of the letters.

[27]Nothing in the record indicates an association between the horse barn lease and lots 2 and 3.

[28]The record does not show who drafted the gift letter. Mr. Wolkoff explained that gift letters are prepared by TNC's regional counsel or someone working under him. Further, Mr.

(continued...)

reviewed either the final gift letter or the earlier draft.[29] Mr. Birle stated that when he signed the earlier draft, he "didn't really give it that much thought". Mr. Wolkoff remembers discussions regarding the horse barn, but he did not verify the information in the gift letter.

As unsatisfying as the explanations offered at trial regarding the omissions in the gift letter (and in the bargain sale gift agreement) were, the record nevertheless demonstrates that TNC and HCAC negotiated the disclosure of the consideration, and that both TNC and HCAC knew the gift letter excluded items of consideration that HCAC received from TNC. We so find. In fact, the record strongly suggests that representatives of TNC and HCAC made a conscious decision to exclude items of consideration received in the 2001 transaction in calculating the amount of the bargain sale gift and to play the audit lottery with the hope of minimizing the tax indemnification amount. After a careful review of the record, we conclude that the gift letter did not include a description or a good-faith estimate of the total

---

[28](...continued)
Wolkoff stated, Mr. Birle worked mostly on this transaction and either Mr. Birle or someone under his direction would have prepared the letter. Mr. Birle, however, testified that someone at Choate probably prepared the letter.

[29]The earlier draft listed the same consideration value as the final gift letter. The only difference was a calculation error.

consideration (i.e., goods and services) that HCAC received in the 2001 transaction.

### 2. Reasonable Reliance

We next address whether HCAC, the Hugheses, or the Marshall Cohans reasonably relied on the gift letter. Like the taxpayers in Addis v. Commissioner, 118 T.C. 528 (2002), HCAC received benefits from TNC that were not disclosed in the gift letter. HCAC bargained for those items in the October 2000 agreement and the final agreement, and TNC agreed to convey those items to HCAC. Before the 2001 transaction closed, Mr. Hughes requested and received the Wallace letter appraising, among other things, the horse barn lease, the Aldeborgh lease, the lot 29 option, and the Wild right-of-way relocation.[30] Mr. Wallace reported that the horse barn lease, the Aldeborgh lease, the lot 29 option, and the Wild right-of-way relocation had a combined value of at least $1.25 million. In addition, Mr. Gleason requested but did not receive from Mr. LaPorte an appraisal of the omitted items. Mr. Gleason sent Mr. Hughes a copy of his request. Despite several

---

[30]Mr. Wallace also valued the enhancements to petitioners' and the Aldeborgh children's existing properties. Although the bargain sale gift agreement lists "beach rights/enhancements" of $750,000, that amount represents only the beach rights. We need not decide whether the enhancements should have been included in calculating the bargain sale gift amount. However, TNC did not request an appraisal regarding the enhancements. As Mr. Giso mentioned in his Oct. 23, 2001, memorandum, he used a "plug" number for the value of the enhancements only to achieve the desired bargain sale gift amount.

requests for an appraisal of the omitted items, neither petitioners nor HCAC's attorneys questioned the gift letter's omissions.

At trial Mr. Hughes could not (or would not) explain why the bargain sale agreement and the gift letter excluded those items. The lack of any credible explanation of the exclusion is not surprising given HCAC's obligation to cooperate with TNC in minimizing the tax liability resulting from the 2001 transaction. TNC memorialized that obligation in the final agreement as follows:

> The LLC [HCAC] will cooperate in good faith with TNC,
> * * *, to permit the conveyances * * * to be structured
> to minimize the state and federal tax impact on the LLC
> resulting from such transfers; provided, however, that
> nothing in this Section 7.1.5 shall be construed as
> requiring the LLC to take any action or to refrain from
> acting, if the LLC's attorneys or tax advisers advise
> the LLC that such action or failure to act could result
> in civil or criminal penalties * * *.

HCAC, petitioners, and their attorneys knew about all of the items of consideration in the final agreement, and they knew or should have known that certain of those items were omitted in calculating the bargain sale gift amount. They also knew about HCAC's contractual obligation to cooperate in structuring the bargain sale gift. Under these circumstances we conclude that neither HCAC, the Hugheses, or the Marshall Cohans reasonably relied on the gift letter to calculate their charitable contribution deductions.

### 3. Substantial Compliance Doctrine

Although petitioners now concede that the omitted items should have been included in the gift letter, they maintain that we should uphold the charitable contribution deductions because the value of the omitted consideration was minor relative to the value of the rights of first refusal and the total consideration. They cite Bond v. Commissioner, 100 T.C. 32 (1993), for their position that substantial compliance is sufficient with respect to section 170 and the regulations thereunder.

In Bond v. Commissioner, supra, we addressed whether the taxpayers substantiated their charitable contribution when they failed to obtain and attach a separate qualified appraisal report to their Federal income tax return as required under section 1.170A-13, Income Tax Regs. The taxpayers included all required information, except the appraiser's qualifications, in their Form 8283, Noncash Charitable Contributions, which they attached to their return, instead of in the separate qualified appraisal report. Id. at 42. Recognizing that the taxpayers provided all information "to establish the substance or essence of a charitable contribution", we concluded that the taxpayers "substantially complied" with the regulations, and we upheld their charitable contribution deduction. Id.

Bond is distinguishable from this case. The taxpayers in Bond failed to follow a formality but otherwise provided all

information required to substantiate their charitable contribution.  HCAC, the Hugheses, and the Marshall Cohans failed to disclose anywhere on their returns information relating to the total consideration received from TNC that was necessary for determining the amounts, if any, of the charitable contribution deductions.  Congress enacted section 170(f)(8) specifically to require disclosure of such information.  See H. Rept. 103-111, at 785 (1993), 1993-3 C.B. 167, 361-362.  HCAC, TNC, the Hugheses, and the Marshall Cohans, and their corresponding attorneys, should have known (and in fact knew) that HCAC had received consideration in the 2001 transaction that was not listed or valued in the gift letter.  They nevertheless blindly relied on the gift letter to calculate the charitable contribution deductions.  We do not accept as credible their explanation for this behavior, and we conclude that neither HCAC, the Hugheses, or the Marshall Cohans substantially complied with section 170(f)(8).  Cf. Smith v. Commissioner, T.C. Memo. 2007–368, affd. 364 Fed. Appx. 317 (9th Cir. 2009).

4.  Conclusion

Because we find that (1) the gift letter did not include a description or a good-faith estimate of the total consideration as required under section 170(f)(8); and (2) any claimed reliance on the letter was unreasonable, we hold that HCAC, the Hugheses, and the Marshall Cohans failed to satisfy the requirements under

section 170(f)(8), and we sustain respondent's disallowance of the charitable contribution deductions.[31]  See Addis v. Commissioner, 374 F.3d at 887 ("The deterrence value of section 170(f)(8)'s total denial of a deduction comports with the effective administration of a self-assessment and self-reporting system.").

III.  Valuation

A.  Background

Respondent contends, and petitioners do not dispute, that HCAC's 2001 gross income includes the fair market values of the

---

[31]Because we conclude that sec. 170(f)(8) disallows any charitable contribution deduction, we need not and do not decide whether HCAC made a bargain sale charitable contribution to TNC or the amount of any such contribution.  We note, however, that it appears that such a contribution was not made.  First, the fair market value of the consideration that HCAC received in the 2001 transaction exceeded the $14 million fair market value of the rights of first refusal.  See United States v. Am. Bar Endowment, 477 U.S. 105, 116-118 (1986).  Second, HCAC seems to have lacked the requisite intent to make a contribution, see id., in that HCAC decided to treat the 2001 transaction as a bargain sale contribution at the suggestion of TNC's counsel.  This suggestion (and HCAC's decision to treat and report the 2001 transaction as such a contribution) occurred near the end of HCAC's and TNC's renegotiation of a few of the terms of the October 2000 agreement.  Tellingly, incident to TNC's ultimately agreeing to pay a greater amount of HCAC's legal costs than previously agreed, TNC in the renegotiations aimed to structure the 2001 transaction to minimize or eliminate its liability to reimburse petitioners for their payment of Federal and State income taxes stemming from the 2001 transaction.  HCAC and TNC both knew during the renegotiations that HCAC's claim to a charitable contribution deduction could reduce or eliminate that liability and that TNC had effectively agreed to pay any tax, interest, and penalty on any ultimate disallowance of the reported deduction.

following property interests:  (1) Blue Heron, (2) Sanderling, (3) lots 2 and 3, (4) the horse barn lease, (5) the Aldeborgh lease, (6) the Wild right-of-way relocation, and (7) the new beach rights.  The parties disagree, however, regarding the fair market values of these property interests (collectively, the disputed property interests).[32]

B.  Fair Market Value Standard

1.  Overview

For Federal income tax purposes the relevant valuation standard is "fair market value", and that term denotes "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs.; see Rolfs v. Commissioner, 135 T.C. 471, 489 (2010); Browning v. Commissioner, 109 T.C. 303, 314 (1997); cf. United States v. Cartwright, 411 U.S. 546, 551 (1973).  We decide the fair market value of the disputed property interests as of the date of the 2001 transaction, on the basis of a hypothetical willing buyer and a hypothetical willing seller. See Doherty v. Commissioner, 16 F.3d 338, 340 (9th Cir. 1994),

---

[32]Although respondent contends that the value of any enhancements to petitioners' and the Aldeborgh children's existing properties resulting from the conservation restrictions imposed in the 2001 transaction must be taken into account in determining HCAC's charitable contribution, respondent does not argue that the value of any such enhancements should be included separately in gross income.

affg. T.C. Memo. 1992-98; Boltar, L.L.C. v. Commissioner, 136 T.C. 326, 336 (2011); Rolfs v. Commissioner, supra at 480-481; Arbor Towers Associates, Ltd. v. Commissioner, T.C. Memo. 1999-213; sec. 1.170A-1(c)(1), Income Tax Regs; see also Estate of Bright v. United States, 658 F.2d 999, 1005-1006 (5th Cir. 1981). The characteristics of these hypothetical persons are not necessarily the same as the personal characteristics of the parties to the 2001 transaction, and we take the views of both hypothetical persons into account. See Estate of Bright v. United States, supra at 1005-1006; Estate of Newhouse v. Commissioner, 94 T.C. 193, 218 (1990); Estate of Scanlan v. Commissioner, T.C. Memo. 1996-331, affd. without published opinion 116 F.3d 1476 (5th Cir. 1997). The fair market value of property reflects its highest and best use as of the date of its valuation, and no knowledge of future events affecting its value, the occurrence of which was not reasonably foreseeable on the valuation date, is given to the hypothetical persons. Estate of Newhouse v. Commissioner, supra at 218; cf. sec. 20.2031-1(b), Estate Tax Regs. The fair market value of property is not affected by whether an owner has actually put the property to its highest and best use. The reasonable and objective possibilities for the highest and best use of property control its value. See United States v. Meadow Brook Club, 259 F.2d 41, 45 (2d Cir.

1958); Stanley Works & Subs. v. Commissioner, 87 T.C. 389, 400 (1986).

2. Common Approaches for Determining Fair Market Value

a. Overview

The Court usually considers one or more of three approaches to determine fair market value:  (1) The market approach, (2) the income approach, and (3) the asset-based approach.  Bank One Corp. v. Commissioner, 120 T.C. 174, 306 (2003), affd. in part, vacated in part sub nom. and remanded on another issue JPMorgan Chase & Co. v. Commissioner, 458 F.3d 564 (7th Cir. 2006).  The question of whether one or more of these approaches applies to a case is a question of law.  See Powers v. Commissioner, 312 U.S. 259, 260 (1941); Bank One Corp. v. Commissioner, supra at 306. We briefly discuss each of these approaches.

b. Market Approach

The market approach (or sales comparison approach as it is sometimes called) is usually helpful in valuing residential property.  This approach requires a comparison of the subject property with similar properties sold in arm's-length transactions in the same timeframe.  Bank One Corp. v. Commissioner, supra at 307.  This approach values the subject property by taking into account the sale prices of the comparable properties and the differences between the comparable properties and the subject property.  Id.  This approach measures value

properly only when the comparable properties have qualities substantially similar to those of the subject property.  Id.

### c.  Income Approach

The income approach is usually helpful in valuing income-producing property such as rental property.  This approach relates to capitalization of income and discounted cashflow.  Id. This approach values property by computing the present value of the estimated future cashflow as to that property.  Id.  The estimated cashflow is ascertained by taking the sum of the present value of the available cashflow and the present value of the residual value.  Id.

### d.  Asset-Based Approach

The asset-based approach is usually helpful in valuing property with new improvements, where the costs of the improvements are readily accessible.  This approach generally values property by determining the cost to reproduce it.  Id.

### C.  Experts

Petitioners and respondent each called a witness to testify as an expert on the valuation of the disputed property interests. Petitioners' witness, Mr. LaPorte, is among other things a Massachusetts general certified real estate appraiser and a senior vice president of Meredith & Grew, Inc., a Boston-based company that provides worldwide real estate services.  Mr. LaPorte's specialty for 30 years has been working on field

variety appraisal and consulting assignments on projects in various States including Massachusetts. Respondent's witness, James J. Czupryna, ASA (Mr. Czupryna),[33] is a Massachusetts certified general real estate appraiser and an independent real estate appraiser and consultant. Mr. Czupryna is familiar with and very knowledgeable about real estate values on Martha's Vineyard, and he has appraised a large number of properties on Martha's Vineyard. Mr. Czupryna also has taught and written on the methodology of valuing land subject to conservation restrictions, and he regularly consults with property owners on measuring the change in market value resulting from conservation easements/restrictions.

The Court recognized each of the proffered expert witnesses as an expert on the valuation of the disputed property interests. Each expert then testified upon direct examination primarily through his expert report(s), see Rule 143(g)(1), which the Court accepted into evidence. We may accept or reject the findings and conclusions of these experts, according to our own judgment. See Parker v. Commissioner, 86 T.C. 547, 561-562 (1986). In

---

[33] The designation "ASA" signifies membership in the American Society of Appraisers. Mr. Czupryna is a senior member with the American Society of Appraisers.

addition, we may be selective in deciding what parts (if any) of their opinions to accept.[34]  See id.

  D.  Overview of Expert Testimony

    1.  Mr. LaPorte

Mr. LaPorte appraised the four properties and reflected his appraisals in a written appraisal report that he issued to TNC on August 24, 2001 (consolidated plan report).  He used July 15, 2001, as the relevant valuation date.  Mr. LaPorte also appraised the four properties assuming that the Wallace family would develop the 33-lot subdivision, in order to value the rights of first refusal; and he issued to Mr. Gleason a separate written report reflecting those appraisals on August 24, 2001 (33-lot subdivision report).

As a preliminary matter, respondent asserts that Mr. LaPorte used the wrong valuation date in the consolidated plan report.  According to respondent, Mr. LaPorte did not consider the conservation restrictions because his valuation date was July 15, 2001, 5 days before TNC imposed the restrictions.  Although Mr. LaPorte conceded at trial that he used the wrong valuation date

---

[34]We note at the outset that both experts referred not to "fair market value" but to "market value" or to "value".  While the meaning of the latter two terms is not necessarily the same as the meaning of the applicable term "fair market value", we find that, except as otherwise noted herein, the meanings are sufficiently similar in the setting at hand to allow us to rely on the experts' opinions to decide the fair market values of the disputed property interests.

in his report, he testified that he considered the conservation restrictions in his appraisals, and we find his testimony on this point to be credible. Mr. LaPorte's consolidated plan report confirms his testimony. The report states in the "SUMMARY OF IMPORTANT FACTS AND CONCLUSIONS" under "ENCUMBRANCES AND EASEMENTS" that the properties were subject to various conservation restrictions and easements. The consolidated plan report also notes that TNC anticipated a limited development plan. We conclude that Mr. LaPorte considered the conservation restrictions in his appraisals in the consolidated plan report.

### 2. Mr. Czupryna

Mr. Czupryna appraised the four properties as of two dates: (1) July 14, 2001, assuming development of the 33-lot subdivision plan; and (2) July 20, 2001, after TNC imposed the conservation restrictions that were part of the 2001 transaction. He issued his report on September 18, 2006.

In his posttrial brief, respondent raises for the first time whether Mr. Czupryna included the values of the new beach rights that attached to each of the four properties in valuing the properties as of July 20, 2001. Respondent contends that Mr. Czupryna did not include the values of those new beach rights in the values he assigned to the four properties. Respondent contends that the value of each of the four properties reflected in Mr. Czupryna's July 20, 2001, appraisal must be increased by

$200,000 to reflect the value of the new beach rights that attached to each property as a result of the 2001 transaction. Respondent's argument requires us to examine Mr. Czupryna's appraisal report to determine whether Mr. Czupryna included the values of the new beach rights in the values he derived for the four properties. Respondent did not ask Mr. Czupryna about this issue at trial.

While Mr. Czupryna appraised the six new beach rights that attached to petitioners' and the Aldeborgh children's existing properties, it is readily apparent that he did not appraise the new beach rights that attached to the four properties. Respondent asks the Court to value the new beach rights that attached to the four properties at the same value that Mr. Czupryna ascertained for each of the new beach rights that attached to the existing properties. We agree that all of the new beach rights have the same fair market value. As we have found, separate beach rights attached to the four properties and to the six existing properties, and each of those rights permanently allowed the same type and extent of access to the same beach. In addition, Mr. Hughes testified that his beach rights had "immense value" and were "priceless", and Mr. LaPorte, in his report, did not differentiate among the new beach rights that attached to the four properties and stated specifically that the new beach rights that attached to three of the four

properties were the "same". Mr. LaPorte also testified that the value of the new beach rights would be the same if none of those rights was discounted to reflect any personal beach right held by an owner of the property and that the undiscounted beach rights were worth between $200,000 and $250,000.[35]

We conclude that the new beach rights significantly enhanced the values of the properties to which they attached by like amounts and that the fair market value of each of the four properties as ascertained by Mr. Czupryna must be increased to include value for the beach rights that attached thereto. We turn now to decide the fair market values of the four properties.

E. Valuation of the Four Properties

1. Blue Heron

a. Mr. LaPorte's Appraisal

In his consolidated plan report, Mr. LaPorte appraised Blue Heron, with its new beach rights, at $625,000. He determined that Blue Heron's highest and best use was as residential property assuming either demolition and new construction or substantial remodeling with additions.

---

[35]Mr. Wallace also ascertained that each of the new beach rights had significant value; and while he did not specifically identify the value of the rights that attached to Blue Heron and to Sanderling, he considered the separate beach rights that attached to lots 2 and 3 to have the same $400,000 value as the new beach rights that he determined attached to the six existing properties.

Using a market approach, Mr. LaPorte evaluated the following three sales as comparable sales:

| Date of sale | Land area | Price | Description |
|---|---|---|---|
| Jan. 26, 2000 | 5 acres | $659,000 | This property is located at 38 Slough Cove Rd. and has a view of Edgartown Great Pond. This property has no private beach access. |
| Feb. 12, 2001 | 1.5 acres | $600,000 | This property is located at 63 Slough Cove Rd., across from Blue Heron. This property is a buildable lot with no private beach access. This property and Blue Heron have identical public beach access. |
| Jan. 2, 2001 | 1.5 acres | $639,000 | This property is located at 65 Slough Cove Rd., adjacent to 63 Slough Cove Rd. and opposite to Blue Heron. This property has no private beach rights. |

Each of these properties was within 800 feet of Blue Heron.

Mr. LaPorte opined that Blue Heron's proximity to the FARM Institute's facilities would negatively affect the privacy of Blue Heron, and he adjusted his appraisal accordingly, although neither his appraisal nor his trial testimony indicated the size of the adjustment.

### b.  Mr. Czupryna's Appraisal

Mr. Czupryna appraised Blue Heron at $715,000 as of July 20, 2001.  Like Mr. LaPorte, Mr. Czupryna used a market approach to value Blue Heron.  His report listed the following "comparable sales" of conventional building lots and waterfront lots and estates:

<u>Conventional Building Lots</u>

| Location | Land area (acres) | Date of sale | Selling price |
|----------|-------------------|--------------|---------------|
| 63 Slough Cove Rd. | 1.5 | Feb. 12, 2001 | $600,000 |
| 65 Slough Cove Rd. | 1.5 | Jan. 12, 2001 | 639,000 |
| 38 Slough Cove Rd. | 5 | Jan. 26, 2000 | 659,000 |

<u>Waterfront Lot Sales</u>

| Location | Land area (acres) | Date of sale | Selling price |
|----------|-------------------|--------------|---------------|
| 19 Atlantic Dr. | 2.23 | Dec. 26, 2000 | $1,500,000 |
| 29 Boldwater | 9.8 | Mar. 15, 2000 | 1,800,000 |
| 48 Witchwood Ln. | 3 | Oct. 15, 1999 | 3,500,000 |
| Turkey Land Cove | 29.3 | Jan. 10, 1998 | 3,150,000 |

<u>Herring Creek Farm Re-Sales</u>

| Location | Land area (acres) | Date of sale | Selling price |
|----------|-------------------|--------------|---------------|
| Lot 10 | 6.5 | July 20, 2001 | $4,000,000 |
| Lots 5 and 6 | 9.62 and 15.85 | July 24, 2001 | 7,250,000 |
| Lots 9 and 10 | 13.46 and 10.37 | July 24, 2001 | 11,000,000 |
| Lot 7 | 8.81 | July 24, 2001 | 12,000,000 |

Mr. Czupryna's report does not state whether he considered all of his comparable sales in appraising Blue Heron (or any of the other three properties). The three sales listed as "Conventional Building Lots" were the same sales that Mr. LaPorte relied upon in his appraisal of Blue Heron.

Mr. Czupryna concluded that the value of Blue Heron was $650,000 without consideration of any enhanced value attributable to the conservation restrictions arising out of the 2001 transaction. With respect to the stated enhanced value, Mr. Czupryna applied a 20-percent increase to the value of Sanderling and lots 2 and 3 because the pastoral scenic vistas were permanently preserved by the restrictions imposed on the surrounding lots through the 2001 transaction. According to Mr. Czupryna, conservation restrictions placed on property often

increase (or enhance) the value of abutting property when the restrictions preserve large tracts of highly visible land as open space, or otherwise permanently preserve panoramic, open vistas from the abutting property.  Such an increased value occurs, Mr. Czupryna testified, because property owners like those on Martha's Vineyard are most concerned with land next to theirs being developed (either residentially or commercially), and the restrictions permanently protect the privacy and seclusion of, and the scenic views from, the abutting property.  Mr. Czupryna ascertained through his research that increase in value ranges from at least 10 percent to 30 percent where conservation restrictions are placed on water-oriented properties.  Mr. Czupryna applied a 10-percent increase to the value of Blue Heron because its otherwise 20-percent increase in value was lessened by the fact that Blue Heron was proximate to the FARM Institute's property.

### 2.  Sanderling

#### a.  Mr. LaPorte's Appraisal

In his consolidated plan report, Mr. LaPorte appraised Sanderling, with its new beach rights, at $1 million.  He determined that Sanderling's highest and best use was as residential property assuming either redevelopment or remodeling with additions.

Mr. LaPorte used a market approach to value Sanderling. Although his report indicated that he based his conclusion on comparable sales cited in his report and on other information on residential sales, Mr. LaPorte did not specify the comparable sales he relied on as he did for the other properties.

Mr. LaPorte opined that the Sanderling house did not add value to the property because the house, besides being undersized for the location, had a broken septic system.  Mr. LaPorte did not inspect the house's interior.  Instead, he relied on information obtained from the property's caretaker who described its condition as fair to average.  Mr. LaPorte acknowledged that the property's setting "is a noteworthy location".

### b.  Mr. Czupryna's Appraisal

Mr. Czupryna appraised Sanderling at $1.2 million as of July 20, 2001.  Like Mr. LaPorte, Mr. Czupryna used a market approach to value Sanderling.  Mr. Czupryna analyzed the same sales in appraising Sanderling that he used in appraising Blue Heron.  Mr. Czupryna concluded that the value of Sanderling was $1 million without consideration of any additional value attributable to the conservation restrictions arising out of the 2001 transaction, and (as previously discussed) that the restrictions increased that value by 20 percent.

3. Lots 2 and 3

    a. Mr. LaPorte's Appraisal

In his consolidated plan report, Mr. LaPorte appraised lot 2 at $2.25 million and lot 3 at $2.5 million. Both valuations included the new beach rights appurtenant to the properties. He determined that the highest and best use for both lots was residential use, and he assumed that each lot would be improved by the construction of a single-family residence. He concluded that lot 3, the smaller of lots 2 and 3, was worth more than lot 2 because lot 2 abutted the FARM Institute's property.

As he did for the other properties, Mr. LaPorte used a market approach to value the lots. He considered the following seven sales as comparable sales:

| Date of sale | Land area | Price | Mr. LaPorte's description |
|---|---|---|---|
| July 2001 | 6.5 acres | $4 million | This lot, located on the farm, had greater privacy and was closer to the private beach than lots 2 and 3. It fronts Crackatuxet Cove and has views of the Atlantic Ocean. |
| Mar. 2000 | 9.8 acres | $1.8 million | This lot, located at 29 Boldwater Rd., is a waterfront lot located in the Boldwater subdivision along the western shoreline of Edgartown Great Pond. This lot has boat access to a private beach. |
| Dec. 2000 | 2.23 acres | $1.5 million | This lot, located at 19 Atlantic Dr., is a vacant residential lot with views of South Beach and the Atlantic Ocean. This lot has no private beach access, but it does have access to the public portion of South Beach. |
| Oct. 1999 | 3 acres | $3.5 million | This lot, located at 48 Witchwood Lane, is a waterfront lot located in a small, high-priced subdivision off of Katama Rd. This lot is wooded and private and has access to and ownership of a private dock. |
| Jan. 1998 | 29.3 acres | $3.15 million | This lot, located between Slough Cove and Turkey Lane Cove, is a waterfront lot on Edgartown Great Pond. This lot is more private than lots 2 and 3 and may have additional development capacity. |
| Dec. 1999 | 0.79 acre | $1.575 million | This lot, located at 93 Edgartown Rd., is a waterfront lot fronting on Katama Bay and overlooking the Atlantic Ocean. This lot includes a modest house and access to the public portion of South Beach. |
| May 2000 | 9 acres | $425,000 | This lot, located at 6 Boldwater Rd., is an interior lot located in the Boldwater subdivision. This lot does not have a view of the water but has access to a common beach. Another similar lot was sold in 2000 for $430,000. |

### b.  Mr. Czupryna's Appraisal

Mr. Czupryna appraised lot 2 at $2.7 million and lot 3 at $3 million as of July 20, 2001.  Mr. Czupryna used a market approach and analyzed five of the seven sales used by Mr. LaPorte (the December 2000 sale, the March 2000 sale, the October 1999 sale, the January 1998 sale, and the July 2001 sale).  Mr. Czupryna concluded that the respective values of lots 2 and 3 were $2.25

million and $2.5 million without consideration of any additional value attributable to the conservation restrictions arising out of the 2001 transaction, and (as previously discussed) that the restrictions increased each of those values by 20 percent.

    4.  Analysis

Both experts opined that real estate on Martha's Vineyard is unique, exclusive, pricey, and in demand. Mr. Czupryna testified that Martha's Vineyard is one of the most desirable resort areas on the eastern coast of the United States, and he noted the natural beauty of the land, the beaches, and the scenery. Mr. LaPorte testified that "Edgartown and the island of Martha's Vineyard * * * are commanding some of the highest prices in New England for resort type properties", that "There have been recent acquisitions of properties in the multi-million dollar price range", and that "Despite the slowdown in the economy, brokers indicate that there still remains a demand for exclusive property." Mr. LaPorte testified that the farm has bucolic vistas along Slough Cove Road and "is one of the most predominant properties in Edgartown and on the island of Martha's Vineyard".

Both experts used a market approach to value each of the four properties, and they analyzed many of the same sales as comparable sales. Neither expert, however, explained how he analyzed the sales upon which he relied, or fully explained the adjustments he made to his comparable sales to arrive at his

valuations.  Nevertheless, the two experts came up with similar values for the properties before Mr. Czupryna adjusted the values to take into account the enhancements in value resulting from the conservation restrictions imposed as a result of the 2001 transaction.  Although both experts claimed to have taken into account the conservation restrictions imposed as a result of the 2001 transaction, only Mr. Czupryna actually explained his analysis and quantified the increased value resulting therefrom.

A major difference in the experts' appraisals of the four properties is their analyses of the impact of the conservation restrictions on the values of the properties.  Mr. LaPorte acknowledged in his appraisal report the imposition of conservation restrictions and the favorable impact they would have on the value of property.  Mr. LaPorte also acknowledged that the four properties benefited from the conservation restrictions imposed through the 2001 transaction in that the restrictions would "preserve the farm's aesthetic quality, provide exclusivity and beach access".  Yet Mr. LaPorte did not analyze or quantify the impact of those restrictions on the values of the four properties.[36]  Mr. Czupryna, in contrast, analyzed the impact of the conservation restrictions and concluded that they resulted in enhancements in value with

---

[36]In addition, while he referenced the new beach rights that attached to the four properties, his appraisal report does not explain or quantify how those rights affected his appraisal.

respect to each of the four properties.  He testified that enhanced value inheres in the fair market values of comparable properties, that these adjustments generally range from at least 10 percent to 30 percent, and that a 20-percent increase is appropriate in the case of each of the four properties absent special circumstances that would lessen the rate for one or more of the properties.  He testified that one such special circumstance is the fact that Blue Heron is proximate to the FARM Institute's property, which in turn deserves a reduction of the 20-percent rate to 10 percent in the case of Blue Heron.  He testified that a 20-percent increase in value applied to Sanderling and to lots 2 and 3.

While neither expert gave us a truly convincing and well-explained analysis of the process he used to arrive at his valuation figures, we generally find Mr. Czupryna's opinion on this subject to be more persuasive than that of Mr. LaPorte.  The scarcity on Martha's Vineyard of unique, exclusive property such as each of the four properties, coupled with the significant restrictions affecting those properties resulting from the 2001 transaction, leads us to conclude, with a single exception, that Mr. Czupryna's conclusions of value for the four properties reflect the prices at which the properties would change hands between a hypothetical willing buyer and a hypothetical willing seller, neither being under any compulsion to buy or to sell and

both having reasonable knowledge of relevant facts.  We therefore

adopt, with one exception, Mr. Czupryna's valuations of the four

properties as set forth in his appraisal report; i.e., $715,000,

$1.2 million, $2.7 million, and $3 million for Blue Heron,

Sanderling, and lots 2 and 3, respectively.[37]  The single exception

is that we disagree with Mr. Czupryna's conclusion that the 20-

percent enhancement rate should not be reduced to 10 percent in

the case of lot 2.  Lot 2 appears to be just as proximate to the

FARM Institute's property as is Blue Heron, and we are persuaded

by the testimony of Mr. LaPorte that the enhanced value of lot 2

on account of the conservation restrictions is lessened by the

fact that some public activity was expected to occur on the FARM

Institute's property.  For the reasons previously given, we will

increase Mr. Czupryna's values to account for the value of the new

beach rights that attached to the four properties.

---

[37]We note that these values, without consideration of the
enhanced values stemming from the restrictions, are consistent
with the corresponding sale(s) occurring in 2001, as adjusted
slightly to take into account the passage of time and the
difference in acreage between each property in question and that
of its corresponding 2001 comparable sale(s).  While the experts
included as "comparable sales" properties that sold before 2001,
we consider those sales to be unrepresentative of the fair market
values of the four properties.  We also note that the benchmark
20-percent increase in value on account of the restrictions is
reasonable on the basis of the record at hand, absent a special
circumstance such as the one that reduced that rate to 10 percent
in the case of Blue Heron.

F.  Horse Barn Lease

    1.  Overview

Mr. LaPorte appraised the leasehold interest under the horse barn lease at $54,500,[38] rounded, as of July 20, 2001.[39]  Mr. Czupryna appraised the same leasehold interest at $120,000, rounded,[40] as of July 20, 2001.[41]  Mr. Czupryna explained that he could not find any comparable rental values for valuing this lease.

Mr. LaPorte and Mr. Czupryna used the same method to appraise the leasehold interest.  They both valued the horse barn and then separately valued the lease of the grazing and paddock area.  They agreed that the value of the leased half of the barn was $36,000.  They differed on the value of the right to use the grazing and paddock area.

---

[38]In his July 14, 2006, appraisal, Mr. LaPorte valued the horse barn lease at $45,000.  However, during testimony, Mr. LaPorte corrected a calculation error to arrive at the $54,500.

[39]As mentioned earlier, Mr. LaPorte, at the request of petitioners, issued a retrospective appraisal of the horse barn lease, the Aldeborgh lease, and the Wild right-of-way relocation in preparation for this litigation.

[40]Mr. Czupryna calculated that the value of the horse barn lease was $120,953 and then rounded that amount down to $120,000.

[41]Although Mr. Czupryna states in his report that he valued the leasehold interest as of July 14, 2001, he acknowledges earlier in the report that the leasehold interest did not arise until July 20, 2001, when the horse barn lease was executed.  We consider the July 14, 2001, date to be a typographical error and treat that date as July 20, 2001.

Using an income approach, Mr. LaPorte and Mr. Czupryna each determined the value of the right to use the grazing and paddock area. They began their calculations with the value of the underlying land and adjusted that value to arrive at the fair market value of the horse barn lease.[42] We compare their calculations as follows:

---

[42]The lease did not indicate the size of the grazing and paddock area as it existed when the parties entered into the lease. However, the lease provides that the relocated grazing and paddock area would be no larger than 6.5 acres. Both experts assumed in their appraisal reports that the grazing and paddock area was 6.5 acres. We do the same.

|                                              | Mr. LaPorte | Mr. Czupryna |
|----------------------------------------------|-------------|--------------|
| Value of 6.5 acres                           | $129,225    | $260,000     |
| Maximal use factor[1]                        | x .33       | x .33        |
|                                              | 42,644      | 85,800       |
| Fair annual return on land                   | x .07       | x .08        |
| Annual land rent                             | 2,985       | 6,864        |
| Adjustment for infrequency of use            | x .50       | ---          |
| Adjusted annual land rent[2]                 | 1,493       | 6,864        |
| Inwood annuity factor for 60 years at 8 percent[3] | x 12.3766 | x 12.3766 |
| Present value of rent                        | 18,478      | 84,953       |
| Depreciated cost of barn                     | 36,000      | 36,000       |
| Fair market value                            | 54,478      | 120,953      |

[1]The maximal use factor represents HCAC's right, with maximum use of the barn, to use 33 percent of the grazing and paddock area for its horses.

[2]The corresponding monthly rent is approximately $124 and $572, respectively.

[3]The Inwood annuity factor helps ascertain the value of the stream of income for the duration of the lease and the present value of the land at the time the owner regains full control of it (at the end of the lease and renewal option).  See Estate of Folks v. Commissioner, T.C. Memo. 1982-43.

We now turn to discuss the three differences in those calculations and our conclusion on the appropriate value.

2.  Land Value

The experts derived different values for the 6.5 acres of land.  Mr. LaPorte valued the land at $19,881 per acre (6.5 x $19,881 = $129,227 (as rounded)).  Mr. Czupryna valued the land at $40,000 per acre (6.5 x $40,000 = $260,000).  According to Mr. LaPorte's appraisal report, Mr. LaPorte derived his per-acre value from a 2001 appraisal of 100.6 acres of restricted land

assessed to TNC. His report, however, does not identify the land or the appraisal on which he relied. Mr. Czupryna's report indicated that he based his valuation of the land on an analysis of several comparable sales. Although his report does not identify the comparable sales, he testified that the comparable sales were a sale of 103 acres of conservation-restricted land in Chilmark (another town on Martha's Vineyard), where the unrestricted portion sold for approximately $37,000 per acre; two parcels of conservation-restricted farmland located in Westport (on the mainland opposite Martha's Vineyard) that sold for roughly $20,000 to $30,000; and other comparable sales of conservation-restricted property in Massachusetts "at the high end".

Mr. LaPorte's value for the land strikes us as simply too low. Although neither expert fully explained how he arrived at his per-acre value, real estate on Martha's Vineyard is very valuable (especially in that part of the island). The evidence, as unsatisfying as it is, leaves us with the distinct impression that Mr. Czupryna's per-acre value is more reliable than Mr. LaPorte's. After analyzing the sales referenced by the experts, and our decision with respect to the four properties, we conclude that the applicable fair market value of the grazing and paddock land was not less than $40,000 per acre. We therefore adopt Mr. Czupryna's valuation of the land at $40,000.

3. Rate of Return

Mr. LaPorte and Mr. Czupryna applied different fair annual return rates to ascertain a fair annual rental return on the land. Mr. LaPorte used a 7-percent annual return rate. Mr. Czupryna used an 8-percent annual return rate.

Mr. Czupryna testified that a fair annual return rate for agricultural land ranges from 6 to 9 percent and that crop-producing land generally yields a higher return than pasture land. He testified that restrictions placed on property by a lease could decrease the fair rate of return. He testified that he set his rate at 8 percent because that rate represents a low-risk rate that he previously used on land rentals to measure a reasonable expectation that rental income would be received on the rental property. He testified that a 7- or 8-percent annual rate reflected a fair return on agricultural land at that time. He testified that the term "agricultural land" generally included both land on which crops could be grown and land for grazing or pasture and that rental values are greater for agricultural crop land as opposed to other types of agricultural land.

Under the terms of the lease, the 6.5 acres of land could be used only for grazing and exercising horses. The limited utility of the land, therefore, supports the lower 7-percent annual return rate used by Mr. LaPorte as opposed to the 8-percent

annual return rate used by Mr. Czupryna.  We therefore adopt Mr. LaPorte's 7-percent annual return rate as the appropriate rate.

### 4. Vacancy Adjustment

The experts disagree on whether a vacancy adjustment applies to decrease the projected annual land rent.  Mr. LaPorte applied a 50-percent vacancy adjustment.  Mr. Czupryna applied no vacancy adjustment.  Mr. LaPorte testified that his vacancy adjustment takes into account a situation where a lessor could not lease the property during every month of the lease's term.

Mr. LaPorte has failed to persuade us that a vacancy adjustment is warranted on the facts before us.  The lease gave HCAC the right to use half of the horse barn and a portion of the grazing and paddock area essentially rent free for the next 60 years, and the appraisal of the lease should reflect that right. Whether HCAC takes advantage of that right after entering into the lease is irrelevant.  We hold that a vacancy adjustment is not warranted in arriving at the fair market value of the leasehold interest.

### 5. Conclusion

The fair market value of the horse barn lease as of July 20, 2001, is $110,334 (($260,000 x .33 x .07 x 12.3766) + 36,000 = $110,334).

G.  Aldeborgh Lease

  1.  Overview

Mr. LaPorte appraised the Aldeborgh lease at $18,000, rounded, as of July 20, 2001.  Mr. Czupryna appraised the Aldeborgh lease at $85,000, rounded, as of July 20, 2001.[43]

Both experts used a market approach to ascertain the applicable value of the land underlying the Aldeborgh lease and then an income approach to ascertain the value of the Aldeborgh lease.  The experts applied the same general formula under their income approaches.  Their calculations are as follows:

|  | Mr. LaPorte | Mr. Czupryna |
|---|---|---|
| Value of underlying land | $27,659 | $166,000 |
| Discount for use limitation at 35 percent | (9,681) | --- |
| Adjusted value of underlying land | 17,978 | 166,000 |
| Fair annual return on land | x .07 | x .08 |
| Annual rent[1] | 1,258 | 13,280 |
| Discount for use limitation at 50 percent | --- | (6,640) |
| Adjusted land rent | 1,258 | 6,640 |
| Inwood annuity factor for 60 years | x 14.03918 | x 12.3766 |
| Fair market value | 17,668 | 82,180 |

[1]The corresponding monthly rent is approximately $105 and approximately $1,107, respectively.

---

[43]Although Mr. Czupryna again stated that he used the July 14, 2001, date as his valuation date, the leasehold interest did not exist until July 20, 2001, when the lease was executed.  We again consider the July 14,2001, date as a typographical error and treat the valuation date as July 20, 2001.

We now turn to discuss the four differences in those calculations and our conclusion on the appropriate value.

### 2. Land Value

The experts disagree on the appropriate value of the land underlying the Aldeborgh lease. Mr. LaPorte valued the land at $27,659. Mr. Czupryna valued the land at $166,000. Mr. LaPorte derived his value by determining that the land was worth $2.77 per square foot, rounded, which he reportedly ascertained from his $500,000 appraisal of lot 102 as part of his 33-lot subdivision plan report.[44] He next applied the unrounded square-foot value to the 10,000-square-foot building envelope and valued the building envelope at $27,659 (10,000 x $2.7659). Mr. Czupryna valued the land by multiplying the entire 4.15 acres of lot 102 by $40,000 per acre (the same per-acre value that he used for the horse barn lease).

The Aldeborgh lease provides that the ground leased premises include lot 102, and, contrary to Mr. LaPorte's calculations, the lease does not restrict the leased land only to the building envelope. Mr. Czupryna, by contrast, concluded that the underlying land subject to the Aldeborgh lease includes the

_____

[44]The square-foot value of lot 102, assuming the entire lot is worth $500,000, equals $2.7659 (($500,000/(43,560 sq. ft/acre x 4.15 acres of lot 102)). Mr. LaPorte actually appraised lot 102 at $750,000 in his 33-lot subdivision report. While the record sometimes refers to lot 102 as lot 32, the record does not show why Mr. LaPorte used $500,000 as his appraised value.

entire 4.15 acres of lot 102.[45]  We agree.  We further agree with Mr. Czupryna's $40,000 per-acre valuation of the underlying land for the same reasons stated with regard to the valuation of the land subject to the horse barn lease.  We conclude that lot 102 was worth $166,000 for purposes of valuing the Aldeborgh lease ($40,000/acre x 4.15 acres).

### 3.  Discount for Restricted Use

Each expert applied a discount to reflect the restrictions on use set forth in the Aldeborgh lease, e.g., that construction on lot 102 is limited to the building of a barn (primarily for the storage of the lessee's personal property and related and incidental uses) of no more than 1,500 square feet on a specific 10,000-square-foot section of the lot.  However, each expert applied a different discount rate to arrive at his adjusted land rent.[46]  Mr. LaPorte applied a 35-percent discount rate.  Mr.

---

[45]Mr. Czupryna appropriately accounts for HCAC's restricted use of the entire lot by discounting the projected annual rent through the use limitation discount rate.

[46]The experts also applied their discount rates to different bases.  Mr. LaPorte ascertained his adjusted land rent by using a formula that applied his discount rate to the value of the underlying land and then multiplied the result by his fair return rate.  Mr. Czupryna ascertained his adjusted land rent by using a formula that multiplied the value of the underlying land by his annual return rate and then applied his discount rate.  From a mathematical point of view, neither expert's conclusion as to the amount of the adjusted land rent would have changed had he followed the formula used by the other expert.  See generally Research & Education Association, Super Review of Basic Math and Pre-Algebra 120-123 (2010) (explaining that under the commutative

(continued...)

Czupryna applied a 50-percent discount rate. Neither expert adequately explained how he ascertained the discount rate. However, given the size of the property and the permissible construction that could be done thereon, we conclude that the applicable discount rate is the 50-percent rate used by Mr. Czupryna (as opposed to the lower rate used by Mr. LaPorte).

### 4. Fair Return Rate

The experts applied different fair annual return rates. Mr. LaPorte used a 7-percent rate. Mr. Czupryna used an 8-percent rate. For the reasons stated in our analysis regarding the horse barn lease, we conclude that 7 percent was a reasonable fair annual return rate.

### 5. Inwood Annuity Factor

The experts used different Inwood annuity factors. Mr. LaPorte's Inwood annuity factor was based on a 7-percent interest rate. Mr. Czupryna's Inwood annuity factor was based on an 8-percent interest rate. Both experts used an 8-percent interest rate to ascertain the annuity factor applicable to the horse barn lease. Petitioners did not offer any evidence explaining why Mr. LaPorte used different Inwood annuity factors for the leases, and we see no reason the rates should be different. We hold that the

---

[46](...continued)
and associative properties of multiplication, the order in which three numbers are multiplied does not change the product of those numbers).

applicable Inwood annuity factor is based on an 8-percent interest rate.

### 6.  Conclusion

The fair market value of the Aldeborgh leasehold interest as of July 20, 2001, is $71,908 ($166,000 x .07 x (1 - .50) x 12.3766 = $71,908).

### H.  Wild Right-of-Way Relocation

Petitioners contend that the relocation of the Wild driveway did not have a material effect on the value of petitioners' properties.  Respondent contends that the value of the Wild right-of-way relocation was $3,751.[47]  The parties do not dispute that TNC paid $3,751 for the relocation, and the evidence includes an invoice substantiating that amount.

Each party's contention on this issue is based primarily on the related testimony of the other party's expert.  Mr. LaPorte estimated that the Wild right-of-way relocation increased the value of Sanderling by $3,751, the cost of the relocation.  Mr. Czupryna stated in his report that the relocation was a "housekeeping detail" and did not "measurably improve" the value of Sanderling.  Mr. Czupryna neither adopted nor rejected Mr.

---

[47]The relocation of the Wild driveway did not occur until sometime in 2002.  However, in the final agreement, TNC agreed to relocate the Wild driveway on demand of HCAC for $1 as of the closing date.

LaPorte's conclusion that the fair market value of the Wild right-of-way relocation was $3,751.

Respondent argues that the issue is not whether the relocation enhanced the value of Sanderling, but rather whether petitioners (through HCAC) received anything of value from the relocation. Mr. Cohan testified that his family received a benefit from the relocation of the Wild family right-of-way because the right-of-way no longer cut across his property (Sanderling). In addition, Mr. Cohan testified that the relocation improved the aesthetics of his property. Mr. LaPorte opined that the value received was equal to the cost of the relocation. Although Mr. Czupryna concluded that the relocation did not measurably improve the value of Sanderling, he did not opine whether the relocation of the right-of-way benefited petitioners without regard to the value of the affected property.

In the absence of more fully developed appraisals, we conclude that the relocation of the Wild family right-of-way provided a benefit to petitioners equal to the cost of the relocation or $3,751.

I.  <u>New Beach Rights</u>

Mr. LaPorte appraised the new beach rights that attached to the existing properties at $125,000 per lot, and he appraised the new beach rights that attached to the four properties at $200,000 to $250,000 per lot.  Mr. Czupryna appraised the new beach rights that attached to the existing properties at $200,000 per lot.

Using an income method, both experts analyzed comparable sales of beach rights in Chilmark.  Over 100 people shared those rights, but the comparable rights, unlike the new beach rights, included amenities such as lifeguard services, toilets, and cabanas.  The comparable beach rights were as follows:

| Date of sale | Price[1] |
|---|---|
| Mar. 2001 | $150,000 |
| Sept. 2000 | 175,000 |
| May 2000 | 225,000 |

[1]One of the two appraisal reports reverses the sale prices for the May 2000 and September 2000 sales.  The specific dates of these sales are not material to our analysis.

Mr. LaPorte discounted to $125,000 the value of the new beach rights that attached to the existing properties because (1) the property owners (namely, petitioners and the Aldeborgh children) already had personal beach rights under the 1969 agreement, (2) the new beach rights could not be transferred separately from the lots, and (3) the properties were within walking distance of a public beach.  Respondent asserts that Mr. LaPorte's use of this discount misapplies the definition of "fair market value".  As respondent sees it, a prudent seller would not

accept a lower price for the new beach rights just because the buyer already had personal beach rights. We agree. The value of the new beach rights must be determined without considering the particular circumstances of a specific buyer or a specific seller, and the views of both hypothetical persons must be taken into account. See Bank One Corp. v. Commissioner, 120 T.C. at 332-333. In addition, focusing too much on the view of one of these hypothetical persons, to the neglect of the view of the other hypothetical person, is contrary to a determination of fair market value.

Mr. LaPorte took into account the personal circumstances of the property owners in valuing the new beach rights that attached to the existing properties. Those new beach rights were deeded rights that attached to and would be conveyed with petitioners' and the Aldeborgh children's existing properties. We are convinced that a hypothetical willing buyer of petitioners' and the Aldeborgh children's existing properties would view the private beach rights as a very valuable attribute of property ownership and would pay accordingly. We are also convinced that no reasonable hypothetical willing buyer or seller would conclude that access to a public beach on Martha's Vineyard, especially during high season, would diminish the value of the private beach rights. To those ends, Mr. Czupryna testified that he had valued many beach rights on Martha's Vineyard and that homeowners on

Martha's Vineyard whose properties were not close to the beach were buying beach rights to ensure themselves access to a private beach and to raise the value of their properties.  While he acknowledged that the new beach rights differed significantly from the comparable beach rights in Chilmark, petitioners did not introduce any other evidence to prove that the appraised value of each new beach right was less than $200,000, the value determined by Mr. Czupryna as to the new beach rights attaching to the existing properties.  Accordingly, given our conclusion supra that the fair market value of all the new beach rights is the same, we conclude that the value of each new beach right was $200,000.

IV.  Gain From the Sale of the Rights of First Refusal

    A.  Overview

    Gross income means all income from whatever source derived, including gains derived from dealings in property.  Sec. 61(a)(3).  Gain from the sale or exchange of property must be recognized, unless the Code provides otherwise.[48]  Sec. 1001(c). Section 1001(a) defines gain from the sale or other disposition of property as the excess of the amount realized on the sale of

_____

[48]Sec. 453(a) and (b), for example, generally provides that income from an "installment sale" is taken into account under sec. 453.  Neither party claims that HCAC's sale of the rights of first refusal was an "installment sale".

property over the adjusted basis of the property sold or exchanged.  See also sec. 1.61-6(a), Income Tax Regs.

B.  Amount Realized

The first step in determining gain on the sale of property involves calculating the amount realized.  The amount realized is the sum of any money received plus the fair market value of any property received.  Sec. 1001(b); Chapin v. Commissioner, 12 T.C. 235, 238 (1949), affd. 180 F.2d 140 (8th Cir. 1950).  The fair market value of property is a question of fact, and property lacks a fair market value only in rare and extraordinary circumstances.  Sec. 1.1001-1(a), Income Tax Regs.

HCAC included in the amount it realized from its sale of the rights of first refusal the values of the four properties (inclusive of what HCAC claimed was the value of the new beach rights that attached thereto), the cash payments for the past and current legal fees, and the tax make-whole payment.  HCAC did not include the value of the new beach rights that attached to the existing properties or the value of the release of the reciprocal right.  We decide whether the fair market values of those omitted items were includable in the amount HCAC realized on the sale of the rights of first refusal.[49]

_____

[49]In addition to these omitted items, HCAC excluded the values of the horse barn lease, the Aldeborgh lease, the Wild right-of-way relocation, the lot 29 option, and the land bank fees paid on behalf of HCAC.  Petitioners concede that the values
(continued...)

Petitioners argue that HCAC did not realize the values of the omitted items on its sale of the rights of first refusal. Respondent argues to the contrary. We agree with respondent. If HCAC received consideration in exchange for the rights of first refusal, HCAC must include that consideration in calculating the amount it realized from the sale. Sec. 1001(b). HCAC received the new beach rights attaching to the existing properties and the release of the reciprocal right as part of the consideration for its sale of the rights of first refusal, and both items had significant value. Section 1001(b) requires that the values of those items be included in HCAC's amount realized for purposes of calculating the gain on the sale of the rights of first refusal.

### 1. Number of New Beach Rights

Petitioners and respondent dispute the number of new beach rights that HCAC received from TNC as to the existing properties. Petitioners argue that HCAC received three such new beach rights, while respondent argues that those new beach rights totaled seven. We disagree with both parties.

### a. Petitioners' Position

Petitioners argue as to the existing properties that HCAC received only the three new beach rights that related to them personally and that any remaining new beach rights attached to

---

[49](...continued) of those items were includable in the amount HCAC realized on the sale of the rights of first refusal.

properties owned by the Aldeborgh children.  Petitioners contend that they should not have to include the value of the new beach rights that attached to and benefited the Aldeborgh children. They contend that the value relating to the new beach rights that attached to the Aldeborgh children's property should be taxable to the Aldeborgh children and not to petitioners.  Petitioners argue that, although the Aldeborgh children were never formal members of HCAC, they should be recognized as "partners" for Federal income tax purposes because they contributed capital to and received proceeds from HCAC with regard to the rights of first refusal.[50]

In determining the amount realized on the sale of the rights of first refusal, we must include the value of all consideration that HCAC received in the 2001 transaction.  A review of the final agreement confirms that all of the new beach rights, including the rights that attached to the Aldeborgh children's properties, were part of the consideration HCAC received.  We conclude, therefore, that the value of the new beach rights that attached to the Aldeborgh children's property must be included in HCAC's amount realized for purposes of determining HCAC's gain on the sale.

---

[50]As mentioned supra p. 7, HCAC is treated as a partnership for Federal income tax purposes.  Its members, therefore, are considered to be "partners".

The question remains whether the Aldeborgh children should be considered partners of HCAC for Federal income tax purposes, and if they should, whether any of the gain attributable to the new beach rights that attached to their properties as a result of the 2001 transaction should be taxed to them. The Code and the regulations do not give much guidance regarding the definition of a partner for Federal income tax purposes. Section 761(b) defines a "partner" as a member of a partnership. Section 704(e)(1) provides that a person shall be recognized as a partner if he or she owns a capital interest in a partnership in which capital is a material income-producing factor, whether or not such interest was derived by purchase or gift from any other person.[51] That provision is not limited to family partnerships but extends to all partnerships. Evans v. Commissioner, 447 F.2d 547, 550 (7th Cir. 1971), affg. 54 T.C. 40 (1970).

The Aldeborgh children did not own a capital interest in HCAC. Although the record provides little detail about the transfer to HCAC of the Aldeborgh children's interests in the rights of first refusal, it appears that the Aldeborgh children assigned all of their interests in those rights to HCAC without

---

[51]A capital interest in a partnership is an interest in the assets of the partnership, which is distributable to the owner of the capital interest upon his or her withdrawal from the partnership or upon the partnership's liquidation. Sec. 1.704-1(e)(1)(v), Income Tax Regs.

seeking or receiving any consideration for the transfer.[52]  They are not listed as HCAC members (or partners), and the record does not reveal that they participated in the events leading up to the July 20, 2001, closing.  We conclude that the Aldeborgh children are not partners of HCAC within the meaning of section 704(e)(1).

Petitioners argue for the first time in their reply brief that the Aldeborgh children are partners of HCAC under the general definition of partner in section 761(b) if acting in good faith and with a business purpose they intended to join together as partners of HCAC.  See Commissioner v. Culbertson, 337 U.S. 733, 742 (1949); Carriage Square, Inc. v. Commissioner, 69 T.C. 119, 128 (1977).  Petitioners elicited no testimony at trial regarding the Aldeborgh children's intent to carry on a business as members of HCAC, and they introduced no other evidence that would establish that intent.  The record also does not otherwise include any proof that the Aldeborgh children, in good faith and with a business purpose, intended to join HCAC as members.  We conclude that the Aldeborgh children are not partners of HCAC for Federal income tax purposes and that none of the new beach rights are taxable to the Aldeborgh children as partners of HCAC.

---

[52]To be sure, the Aldeborgh children's rights of first refusal were worth significantly less than the rights of first refusal which the Aldeborghs and the Marshall Cohans held because the children's rights were only exercisable if the Aldeborghs and the Marshall Cohans failed to exercise their rights.

b.  Respondent's Position

Respondent argues as to the existing properties that HCAC received seven new beach rights from TNC, and he relies on a document titled "Easement for Beach Rights" to support his argument.  Respondent's reliance is misplaced.  Although the "Easement for Beach Rights" may indicate that HCAC received seven beach rights, the final agreement clearly states that TNC granted HCAC six new beach rights.  Those six new beach rights consisted of three beach rights that attached to petitioners' three existing properties and three new beach rights that attached to the Aldeborgh children's three properties.  The number of new beach rights set forth in the final agreement is consistent with the number of new beach rights that Mr. Czupryna valued in his appraisal report.  Consistent with the final agreement, we find that HCAC received from TNC in the 2001 transaction six new beach rights attaching to the existing properties.

2.  Release of the Reciprocal Rights Encumbering the Aldeborgh Children's Existing Properties

Petitioners argue that the value of the release of the reciprocal rights that encumbered the Aldeborgh children's property should not be included in petitioners' gross income.  They make the same argument that they made regarding the new beach rights that attached to the Aldeborgh children's properties.  For the reasons stated with regard to the new beach rights, we conclude that the value of the release of the

reciprocal right encumbering the Aldeborgh children's properties is included in HCAC's amount realized for purposes of calculating the gain on the disposition of the rights of first refusal.  We conclude similarly that any gain attributable to those reciprocal rights is taxable to the members/partners of HCAC, none of whom were the Aldeborgh children.

C.  Adjusted Basis

In order to calculate the gain realized from the 2001 transaction, we must subtract HCAC's adjusted basis in the rights of first refusal from the amount realized by HCAC from its sale.  Section 1011(a) generally provides that a taxpayer's adjusted basis for determining the gain from the sale or other disposition of property shall be its cost, adjusted to the extent provided by section 1016.[53]  See also sec. 1012.  Under section 1016(a)(1), the basis of property must be adjusted for expenditures, receipts, losses, or other items properly chargeable to capital account.  A taxpayer has the burden of proving the basis of property for purposes of determining the amount of gain the taxpayer must recognize.  O'Neill v. Commissioner, 271 F.2d 44, 50 (9th Cir. 1959), affg. T.C. Memo. 1957-193.

---

[53]The special adjusted basis computation rule that applies to bargain sales to charitable organizations is inapplicable because HCAC was not allowed to claim a charitable contribution deduction.  See sec. 1011(b); sec. 1.1011-2(a)(1), Income Tax Regs.

HCAC reported on its 2001 Schedule D, Capital Gains and Losses, that its basis in the rights of first refusal was $825,162. Respondent concedes that $607,157[54] of the $825,162 is included in HCAC's basis, while petitioners concede that $26,271 is not included.[55] In addition, petitioners did not introduce any evidence substantiating the $404 in bookkeeping and accounting expenditures, the $19,169 paid to PMBC, and the $500 paid to Horsley & Witten, which were included in the $825,162. We sustain without further comment respondent's determination that the $404, $19,169, and the $500 are not included in HCAC's adjusted basis of the rights of first refusal, see id., and we turn to decide whether the remaining items in the $825,162, each of which was personally paid by Mr. Hughes, should be included in HCAC's basis. Those remaining items are: (1) The $35,000 paid

---

[54]Respondent's concession reflects the $566,030 of capital expenditures paid to Nutter and the $41,127 paid to Horsley & Witten. Respondent stipulated that if the Court holds that the disposition of the rights of first refusal qualifies for capital gain treatment, respondent concedes that the $41,127 paid to Horsley & Witten is included in the adjusted basis of those rights. It appears that there is an error in the stipulation of facts regarding the Horsley & Witten payment. The parties stipulated that HCAC paid $23,000 in 2000 and $17,126.96 in 2001, yet they stipulated HCAC paid $41,127 to Horsley & Witten. We leave it to the parties to account for this discrepancy in their computation(s) under Rule 155.

[55]Petitioners' concession reflects the $6,000 paid to Nutter for HCAC's sec. 212 expenses, the $6,607 paid to Nutter for the Marshall Cohans' sec. 212 expenses, and the $13,664 paid to Nutter for nondeductible personal expenditures.

to Wallace & Co., (2) the $100,000 success fee paid to Nutter, and (3) the $36,662 paid to Nutter for tax advice.[56]

### 1. Wallace & Co. Payment

Petitioners argue that the Wallace & Co. payment should be included in HCAC's basis in the rights of first refusal. They contend the payment was for the Wallace letter, which Mr. Hughes used to negotiate the amount of the escrow account covering the tax make-whole payment. As Mr. Hughes sees it, the Wallace letter helped ensure that TNC placed adequate funds in escrow to cover the tax make-whole payment.

Respondent contends that the Wallace & Co. payment was not entirely for the Wallace letter but was partly for consulting work. As respondent sees it, none of the $35,000 is deductible because petitioners failed to establish the portion of the $35,000 that is attributable to the Wallace letter. Respondent also argues that the payment, even if entirely for the Wallace letter, is not entirely includable in HCAC's basis in the rights because the Wallace letter related to the values of items that

---

[56]After trial, petitioners moved to reopen the record for additional evidence. Petitioners sought to have admitted the testimony of Mr. Hughes regarding the verification of certain checks that he wrote. Despite several requests from respondent before trial, petitioners refused to provide documentation to support their claimed deduction in accordance with the Court's pretrial order. We therefore denied petitioners' motion, and we decide this issue on the record before us.

HCAC received in the 2001 transaction and not to the value of the rights of first refusal.

We hold that petitioners have failed to prove that the Wallace & Co. payment is included in HCAC's adjusted basis in the rights of first refusal. Despite several requests from respondent before and during trial, petitioners did not provide any evidence to prove that the Wallace & Co. payment is included in the rights' adjusted basis, and they did not call Mr. Wallace as a witness to testify as to the services he rendered in consideration for the payment. In addition, HCAC obtained the Wallace letter to estimate the tax make-whole payment, and the letter reflects Mr. Wallace's opinion on the value of the consideration that HCAC and petitioners were to receive from TNC, not his opinion on the value of the rights of first refusal. We sustain respondent's determination on this issue.

### 2. Success Fee

Mr. Hughes paid a $100,000 "success fee" to Nutter. The amount of this "fee" was not set until after the consummation of the 2001 transaction. Petitioners assert that the success fee represents a contingency fee for the successful disposition of the rights of first refusal to TNC and for the protection of that right in the Wallace litigation. However, they did not introduce any evidence from which we can determine the appropriate treatment of the success fee. Consequently, on the record before

us, we cannot conclude that the success fee payment is properly included in HCAC's adjusted basis in the rights of first refusal. We therefore sustain respondent's determination on this issue. See O'Neill v. Commissioner, 271 F.2d at 50.

### 3. Tax Advice

Mr. Hughes paid $36,662 to Nutter for tax advice. Petitioners argue that this payment related to Mr. Fryzel's and Mr. Gleason's work during the negotiations and closing of the final agreement. Respondent contends that the payment was a deductible expense under section 212(3) because it related to reporting the 2001 transaction on HCAC's and petitioners' Federal income tax returns and thus does not increase HCAC's adjusted basis. Section 212(3) lets individuals deduct all ordinary and necessary expenses paid or incurred during the taxable year in connection with the determination, collection, or refund of any tax. Any payments deductible under section 212(3) do not increase a taxpayer's adjusted basis in property. See sec. 1.1016-2(a), Income Tax Regs.

We conclude that the $36,000 payment was for Mr. Fryzel's advice concerning HCAC's and petitioners' reporting of the 2001 transaction for Federal income tax purposes. Mr. Fryzel testified that he advised HCAC on whether to include in income the value of the new beach rights and the release of the reciprocal right. In addition, Mr. Ridgeway sent Mr. Hughes a

letter stating that on the basis of advice from Mr. Fryzel, certain enhancements were excluded in calculating petitioners' reporting positions. Ms. McMorrow also sent a December 10, 2001, email to Mr. Ridgeway and Mr. Fryzel regarding HCAC's tax liability with an attached chart of petitioners' reporting positions.

Petitioners had detailed invoices from Nutter regarding the tax advice payment, but they did not introduce those invoices during trial. The evidence in the record regarding the Nutter payment is not sufficient to satisfy petitioners' burden of proof on this issue. We are unable to determine what part, if any, of the tax advice payment related to advice other than in connection with determining HCAC's or petitioners' Federal income tax liability. We sustain respondent's determination on this issue. See O'Neill v. Commissioner, supra at 50.

V.  Character of Gain

The parties dispute whether HCAC's gain on the sale of the rights of first refusal is taxable as a long-term capital gain or as ordinary income. Petitioners argue that the gain is taxable as a capital gain because HCAC's disposition of the rights was a sale or exchange of a capital asset within the meaning of section 1222(3). Respondent argues that the disposition was not a sale or exchange because the rights were personal and nontransferable under the terms of the 1969 agreement. In addition, respondent

asserts, the rights of first refusal were not sold or exchanged;
HCAC canceled or terminated those rights, or they simply ceased
to exist.  Respondent does not dispute that the rights of first
refusal were capital assets.  We agree with petitioners on this
point.

HCAC's gain on its disposition of the rights of first
refusal is taxable as a long-term capital gain if the disposition
was the sale or exchange of a capital asset held for more than 1
year.  See sec. 1222(3); see also Dobson v. Commissioner, 321
U.S. 231, 231-232 (1944).  The Code does not define the term
"sale or exchange" for purposes of section 1222(3).  However,
courts have generally defined the term "sale" by its ordinary
meaning to denote a transfer of property for a fixed amount in
money or its equivalent.  Helvering v. William Flaccus Oak
Leather Co., 313 U.S. 247, 249 (1941); Ray v. Commissioner, 18
T.C. 439, 441 (1952), affd. 210 F.2d 390 (5th Cir. 1954).  The
term "exchange" is construed similarly, except that an exchange
reflects the fact that no price is set for the property
exchanged.  Gruver v. Commissioner, 142 F.2d 363, 365-366 (4th
Cir. 1944), affg. 1 T.C. 1204 (1943).

Respondent's arguments rest on his proposed finding that
HCAC terminated the rights of first refusal as opposed to
transferring those rights to TNC.  Respondent supports his
argument with another proposed finding that HCAC could not have

sold or exchanged the rights of first refusal because they were personal and nontransferable. The record, however, does not support either proposed finding, and we decline to make either. To the contrary, the record establishes, and we find, that HCAC sold the rights to TNC in consideration for money and property, and TNC in turn terminated the rights, after receiving their passage, incident to its purchase of the farm from the Wallace family. We read nothing in the 1969 agreement that provides (nor do we find) that the rights, while "personal", could not be transferred to HCAC or to TNC under the facts herein. In fact, respondent's argument is contrary to the parties' stipulation No. 17 and to respondent's determination in the notices of deficiency. The stipulation states that the rights of first refusal "were assigned to HCAC in December of 1995." The notices state that HCAC "conveyed" the rights of first refusal to TNC.[57]

Respondent also argues that HCAC could not have sold the rights of first refusal because those rights "vanished" with the 2001 transaction incident to the Wallace family's sale of the

---

[57]Moreover, regardless of whether the rights of first refusal were transferable, we find that the rights were in fact transferred first to HCAC and later to TNC, and that the later transfer was apparently done with the knowledge and consent of all persons with an interest in those rights. Respondent also argues that the substance of the transaction compels a holding for him. We disagree. The mere fact that the rights of first refusal may have had to be terminated for the 2001 transaction to occur does not necessarily mean that HCAC had to be the one who terminated those rights.

encumbered land.  Respondent relies primarily upon <u>Nahey v. Commissioner</u>, 111 T.C. 256 (1998), affd. 196 F.3d 866 (7th Cir. 1999), to support this argument.[58]  Respondent's reliance on <u>Nahey</u> is misplaced.

In <u>Nahey v. Commissioner</u>, <u>supra</u> at 265, we concluded that proceeds from the payment of the settlement of a lawsuit were taxable as ordinary income because the settlement was not a sale or exchange under section 1222.  We noted that the rights in the lawsuit "vanished both in form and substance" on receipt of the payment and that the payor did not receive any property or property rights which could later be transferred.  <u>Id.</u> at 264- 266.  We analogized the payment to an extinguishment of a debt. <u>Id.</u>

In contrast to the facts of <u>Nahey</u>, HCAC's sale of the rights of first refusal was not an extinguishment of a claim; the owner of the encumbered land continued to have rights in the property. The release gave the owner of the encumbered land the right to

---

[58]Respondent also relies on other cases, each of which is factually distinguishable from this case.  For example, respondent cites <u>Wolff v. Commissioner</u>, 148 F.3d 186, 188-189 (2d Cir. 1998), revg. <u>Estate of Israel v. Commissioner</u>, 108 T.C. 208 (1997), where the court held that there was no sale or exchange under sec. 1222 on the cancellation of forward contracts because on cancellation, the contract (the underlying asset) ceased to exist and all rights and obligations with respect to that contract were released.  Here, the underlying asset (the encumbered land) did not cease to exist on the release of the rights, and the owner of the encumbered land continued to have rights in the property.

immediately sell the property without having to offer it first to the Marshall Cohans and the Aldeborgh families for the price stated in the 1969 agreement. Additionally, the underlying asset here (the encumbered land) did not cease to exist as did the lawsuit in <u>Nahey</u>.

Congress enacted the capital gain provisions to relieve taxpayers of the heavy tax burden that resulted from situations like this one where a capital asset has appreciated over time. See <u>Corn Prods. Ref. Co. v. Commissioner</u>, 350 U.S. 46, 52 (1955) (stating that capital gains treatment was intended "'to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions.'" (quoting <u>Burnet v. Harmel</u>, 287 U.S. 103, 106 (1932))). The Marshall Cohans and the Aldeborgh families held the rights of first refusal for more than 30 years, and during that time the value of the rights fluctuated with the value of the encumbered land. The appreciation did not result from ordinary income type activities but from the market value of the encumbered land. See <u>Michot v. Commissioner</u>, T.C. Memo. 1982-128.

We hold that HCAC's sale of the rights of first refusal is a sale or exchange of a capital asset under section 1222(3) and that the resulting gain is taxed as a long-term capital gain.

VI.  Accuracy-Related Penalties

    A.  Overview

    Respondent contends that petitioners are liable for the section 6662(a) penalties on alternative grounds:  (1) The underpayments were attributable to negligence or disregard of rules or regulations within the meaning of section 6662(b)(1), or (2) there were substantial understatements of income tax within the meaning of section 6662(b)(2).  Petitioners contend that they are not liable for the section 6662(a) penalties because (1) they were not negligent, (2) there are no substantial understatements of income tax, and (3) in any event, they qualify for relief from the penalties under section 6664(c)(1).

    B.  In General

    Section 6662(a) and (b)(1) authorizes the Commissioner to impose an accuracy-related penalty equal to 20 percent of the portion of an underpayment attributable to negligence or to disregard of rules or regulations.  In this context, negligence is defined as any failure to make a reasonable attempt to comply with the provisions of the Code.  Sec. 6662(c); see also Neely v. Commissioner, 85 T.C. 934, 947 (1985) (negligence is lack of due care or failure to do what a reasonable prudent person would do under the circumstances).  Negligence is strongly indicated where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit, or exclusion on a return that

would seem to a reasonable and prudent person to be "too good to be true" under the circumstances.  Sec. 1.6662-3(b)(1)(ii), Income Tax Regs.

The Commissioner also is authorized to impose an accuracy-related penalty equal to 20 percent of the portion of an underpayment attributable to a substantial understatement of income tax.  Sec. 6662(a) and (b)(2).  A substantial understatement of income tax with respect to an individual taxpayer exists if, for any taxable year, the amount of the understatement for the taxable year exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year or $5,000.  Sec. 6662(d)(1)(A).

Section 6664(c)(1) sets forth an exception to the imposition of a section 6662(a) penalty.  It provides that generally "No penalty shall be imposed under * * * [section 6662] with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."  Whether a taxpayer had reasonable cause for, and acted in good faith with respect to, part or all of an underpayment is determined on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs.  The most important factor is the extent of the taxpayer's effort to assess the proper tax liability.  Id.

C.  Respondent's Initial Burden of Production

Although an individual taxpayer bears the burden of proving that he or she is not liable for a section 6662(a) penalty determined by the Commissioner, Pahl v. Commissioner, 150 F.3d 1124, 1131 (9th Cir. 1998), affg. T.C. Memo. 1996-176, the Commissioner has the initial burden of producing evidence to support the applicability of such a penalty, sec. 7491(c).  To meet this burden, the Commissioner must come forward with sufficient evidence to show that it is appropriate to impose the penalty.  See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).  If the Commissioner satisfies his burden of production, the burden of producing evidence shifts to the taxpayer, who must demonstrate by a preponderance of the evidence that he or she is not liable for the penalty either because the penalty does not apply or because the taxpayer qualifies for relief under section 6664(c).

Respondent introduced evidence showing that HCAC, petitioners, and their counsel knew about the various items of consideration that HCAC received in the 2001 transaction and that HCAC, petitioners, and their counsel were well aware of the total consideration received when the bargain sale gift agreement and gift letter were being negotiated and finalized.  Respondent also introduced evidence showing that HCAC, petitioners, and their counsel knew or should have known that HCAC's 2001 income tax

return did not accurately report the amount realized from the 2001 transaction and that HCAC, the Hugheses, and the Marshall Cohans claimed charitable contribution deductions that were artificially inflated in amount through the exclusion of some of the consideration that HCAC received in the 2001 transaction. Respondent also demonstrated that there were underpayments attributable to substantial understatements of income tax on petitioners' 2001 returns. We conclude that respondent introduced sufficient evidence to satisfy his burden of production under section 7491(c).

D.  Analysis

We now turn to examine whether petitioners have proven that they are not liable for the section 6662(a) penalties. Because respondent has met his burden of production, petitioners must come forward with sufficient evidence to persuade the Court that respondent's determination is incorrect. See Higbee v. Commissioner, supra at 446-447. Petitioners contend that section 6664(c) relieves them from the section 6662(a) penalties because they had reasonable cause for the underpayments of tax and acted in good faith with respect to the underpayments. Petitioners contend more specifically that: (1) Mr. Hughes reasonably relied in good faith on the advice of independent professional advisers, Mr. Fryzel and Mr. Ridgeway, regarding the proper reporting of the 2001 transaction, and (2) the Marshall Cohans and the

Aldeborghs reasonably relied in good faith on the Schedules K-1 issued to them by HCAC for the reporting of the 2001 transaction. Petitioners have the burden of proving reasonable cause and good faith.  Id.

A taxpayer's reasonable reliance in good faith on the advice of an independent professional adviser as to the tax treatment of an item can constitute reasonable cause under certain circumstances.  See United States v. Boyle, 469 U.S. 241, 250 (1985); sec. 1.6664-4(b)(1), Income Tax Regs.  The taxpayer must show that (1) the adviser was a competent professional who had sufficient expertise to justify the taxpayer's reliance on him or her, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment.  See Neonatology Associates, P.A. v. Commissioner, 115 T.C. at 98-99; Sklar, Greenstein & Scheer, P.C. v. Commissioner, 113 T.C. 135, 144-145 (1999).

We conclude that petitioners acted with reasonable cause and in good faith as to the underpayments attributable to (1) the omission of the values of the new beach rights and the release of the reciprocal right from HCAC's amount realized on the sale of the rights of first refusal and (2) the undervaluation of the four properties.  Petitioners introduced both documentary and testimonial evidence establishing HCAC's reliance on Mr. Fryzel's advice regarding whether the new beach rights and the release of

the reciprocal right should be included in the amount realized and HCAC's reliance on Mr. LaPorte's appraisals of the four properties. Both Mr. Fryzel and Mr. LaPorte were experienced professionals who had sufficient expertise to justify the reliance placed upon them. The evidence establishes that HCAC provided Mr. Fryzel and Mr. LaPorte with necessary and accurate information regarding the 2001 transaction and that HCAC and petitioners reasonably relied on those professionals' advice in reporting the 2001 transaction. Thus, petitioners are not liable for the section 6662(a) penalties on the underpayments attributable to those items.

However, we reach a different conclusion with respect to the remaining portions of the underpayments. Petitioners have not established that they acted with reasonable cause and in good faith with respect to the remaining underreporting of gain on the sale of the rights of first refusal. Petitioners also have not established that the Hugheses and the Marshall Cohans acted with reasonable cause and in good faith with respect to the charitable contribution deductions. To both ends, petitioners have not introduced any credible evidence indicating that they sought professional advice regarding the substantiation of the charitable contribution deductions or the treatment of the horse barn lease, Aldeborgh lease, lot 29 option, Wild right-of-way relocation, and land bank fees. Petitioners knew they received

those items; however, they failed to seek professional advice regarding whether those specific items should have been included in the gift letter and in HCAC's income on the sale of the rights. Instead, petitioners blindly relied on the gift letter from TNC despite their knowledge that TNC had a financial stake in the reporting of the 2001 transaction.[59] The record also contains no evidence that HCAC or petitioners sought professional advice regarding the items erroneously included in the basis of the rights of first refusal.

We also disagree with petitioners' argument that the Marshall Cohans and the Aldeborghs acted with reasonable cause and in good faith by relying on the Schedules K-1 issued by HCAC. A taxpayer may not rely on the information on an information return (e.g., a Schedule K-1) if the taxpayer knows, or has reason to know, that the information is incorrect. Sec. 1.6664-4(b)(1), Income Tax Regs. The Marshall Cohans and the Aldeborghs knew or should have known, through their agent Mr. Hughes, that they were receiving the benefit of omitting items from the amount realized on the sale of the rights. In addition, the Marshall Cohans knew that they were receiving the benefit of omission of the Wild right-of-way relocation from the gift letter. Despite

[59]Petitioners, on the other hand, lacked any financial stake in the accuracy of the reporting of the 2001 transaction, because TNC and HCAC had agreed that TNC would pay any tax, penalties, or interest petitioners owed as to the transaction.

their knowledge, there is no credible evidence in the record that they sought the advice of a tax professional regarding the proper treatment of those items.  We have no basis for deciding that the Marshall Cohans and the Aldeborghs acted with reasonable cause and in good faith in relying on the Schedules K-1 under these circumstances.

Consequently, we sustain respondent's determination of negligence penalties under section 6662(a) and (b)(1) with regard to petitioners' underpayments attributable to the denial of the charitable contribution deductions and the underreporting of gain on the sale of the rights of first refusal relating to the omission of the horse barn lease, the Aldeborgh lease, the lot 29 option, the Wild right-of-way relocation, and the land bank fees from the amount realized on the sale and the overstatement of the rights' adjusted basis.

VII.  Remaining Arguments

We have considered all arguments made by the parties, and to the extent not discussed above, we reject those arguments as irrelevant, moot, or without merit.

To reflect the foregoing,

Decisions will be

entered under Rule 155.